Gregory T. GROSE, Appellant,

v.

NISSAN NORTH AMERICA, INC., State Farm Automobile Insurance CO. and Scott Locker, Respondents.

No. ED 77609.

Missouri Court of Appeals, Eastern District, Division Two.

May 22, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 19, 2001.

Application for Transfer Denied Aug. 21, 2001.

Steven Ringkamp, Spencer Farris, The Hulverson Law Firm, St. Louis, MO, for appellant.

G. Keith Phoenix, John E. Galvin, Carl J. Geraci, Sandberg, Phoenix & Von Gontard, P.C., St. Louis, MO, for respondent Nissan.

Gerard T. Noce, Hillary R. Huffman, Noce & Buckley, L.L.C., St. Louis, MO, for respondent State Farm.

Jeffrey K. Suess, Wendellyn S. Wright, Rynearson, Suess, Schnurbusch & Champion, L.L.C., St. Louis, MO, for respondent Scott Locker.

## OPINION

JAMES R. DOWD, Judge.

Gregory Grose, while riding in the rear of a Nissan hatchback, was seriously injured when the Nissan went out of control and was struck by a tractor trailer. He filed a petition alleging negligence against Scott Locker, driver of the car, products liability against Nissan North America, Inc. and an uninsured motorist claim against State Farm Automobile Insurance Company. The jury returned verdicts in

favor of all defendants. Grose appeals claiming error in the admission of a videotape and certain expert testimony.

We state the evidence in the light most favorable to the verdict. At approximately 8:10 p.m. on November 10, 1995, Scott Locker was driving his 1990 Nissan 300ZX east on Interstate 70 across the Blanchette Bridge. It was about 40 degrees Fahrenheit and raining. Tim Brazzle was beside him in the passenger seat, and because the 300ZX has only two seats, Gregory Grose was lying in the hatchback area behind the seats. They were on their way from St. Charles, Missouri to a friend's home in the Central West End of St. Louis City.

When Locker's car began to cross the Blanchette Bridge, it was in the far right of the four eastbound lanes. Shortly after getting on the bridge, Locker lost control of the car. The car went into a spin and the rear passenger side of the Nissan collided with the right rear tire of a semi-tractor trailer traveling in the next lane. This tractor trailer was driven by Darold Hibler. The impact propelled the Nissan into another spin until it nearly came to rest facing the eastbound traffic with the rear passenger portion of the car in the next lane of traffic. The rear passenger side was then struck by another tractor trailer, driven by David Loftsgard. During this second collision the hatchback door of the Nissan flew open and Grose was propelled onto the highway. As a result Grose received numerous injuries and was rendered paraplegic at the level of the T10 vertebrae.

Grose filed suit against Nissan and State Farm in December of 1997 and against Locker in February of 1998. His petition made separate claims against all three named defendants. Against Nissan, Grose alleged that the latch designed to secure the hatchback was defective, permitting him to be ejected from the car. The count

against Scott Locker alleged excessive speed and inattention to the road conditions. The count against State Farm Insurance Company claimed that a phantom vehicle caused Locker's vehicle to spin out of control invoking the uninsured motorist provisions of State Farm's policy.

In his first point of error Grose argues that the court erred in admitting into evidence and playing for the jury a videotape depicting a simulated crash between a semi-tractor trailer and a 1990 Nissan 300ZX. The video shows a crash between a 78,000 pound tractor trailer and a 3,000 pound Nissan 300ZX from several different angles, first at actual speed and then in slow motion. The video begins by showing a tractor trailer, viewed from the passenger side, accelerating down pavement. The viewer hears the sound of the engine and of the truck lumbering down the track. The truck then crashes into the rear passenger side of a red Nissan 300ZX. After showing the truck come to a stop, the video shows that same crash from the driver's side of the truck, from above the car, from the passenger side window of the car, and from the hatchback area. In some of the angles a metal restraining bar attached to the hatchback area of the car is clearly seen to give way as the hatchback flies open. The video then shows post-accident pictures of the truck and car from several angles, revealing the damage. The video, played uninterrupted, runs approximately seven and one-half minutes.

Grose argues that Nissan's video was in fact a staged re-creation of the crash and thus Nissan was required to show that the underlying conditions of the video were substantially similar to the actual crash. Grose argues that significant differences between the test crash and the actual crash misled the jury on the critical issues of the crash-worthiness of the Nissan and the survivability of the crash. He claims

there was no need to admit the video because the pictures of the actual crash vehicle adequately demonstrate the force of the crash. Grose maintains that because the video was only marginally relevant, its misleading effect outweighed its probative value and it should not have been admitted.

In support of this, Grose points to a number of differences between the test and the actual crash. Nissan does not contest the existence of these differences. First, the actual crash occurred on a rain-slick road at 40 degrees Fahrenheit and the test crash was conducted in Utah in late July on dry pavement. Second, the weight distribution of the Nissan in the test crash was different from that in the actual crash. Gregory Grose, who weighed approximately 170 pounds, was lying in the hatchback area of the Nissan in the actual crash. The Nissan in the test crash did not have comparable ballast in the hatch area and also had significant additional weight on the hood of the car in the form of cameras and other instrumentation to record the crash which served to alter the Nissan's center of gravity. Consequently, the rear of the test Nissan was three to four inches higher from the ground than in the actual crash. Third, the impact angle in the test crash was different from that of the actual crash because the truck bumper in the test crash hit the rear of the Nissan 5 to 6 inches closer to the truck's midline. This difference, along with the dry pavement and height of the rear of the Nissan, produced damage to the test vehicle that was different from the vehicle in the actual crash. A fourth, and very curious difference is that the Nissan in the test crash had a metal restraining bar welded to the hatchback and frame of the car. Nissan's expert testified that the bar was welded there so that the hatchback would not open and distract the jury. Nevertheless, several frames in the video clearly show the restraining bar giving way and the hatchback flying open. No evidence was presented on the nature or integrity of the weld securing the restraining bar to the Nissan.

Nissan defended the admission of the videotape at trial on two grounds. First, counsel for Nissan said that its expert would testify that the crash video "is substantially similar in all essential aspects as to the real accident." Nissan then argued that "most all aspects of the test are substantially similar to the accident". But finally counsel for Nissan argued for the admission of the video by stating "[t]he real purpose in this test is to bring in some demonstrative evidence for the jury so that they can understand the severity of the impact when an 80,000 pound tractor trailer hits a 3,000 pound Nissan." Nissan argued that the video was relevant to show that this was not a "slight impact" and that it would take more than "just a knock [or] a bump" to release the hatch.

The trial court ruled that it would admit the video, "based upon the representation made by the proponent of this evidence. In other words, the defendant Nissan. And it was going to be used to illustrate the force of impact in this collision", provided a proper foundation was laid and the video would not mislead the jury into thinking it was a re-enactment.[1] Immediately before showing the video, the court gave the following instruction to the jury:

---

1. There is no indication from the transcript that the trial judge viewed the videotape prior to it being shown to the jury. The practice followed in other jurisdictions is for the record to reflect that the trial court viewed the video itself, avoiding the need to rely on the representations of counsel as to its contents. *See Loevsky v. Carter,* 70 Haw. 419, 773 P.2d 1120, 1123 n. 6 (1989).

Ladies and gentlemen, you're about to see a video. You may not consider the video you are about to see as a re-enactment of any collision in this case, but you may only consider the video as a demonstration of the severity of an impact of a 78,000–pound tractor trailer hitting a stationary Nissan 300ZX at 23 miles per hour.

The video was then shown to the jury. Nissan's expert, Charles Strother, explained the different perspectives the video provided of the test crash. During his testimony he repeatedly compared the crash in the video to the actual crash. When the video showed the accident from the perspective of the camera in the hatchback area, the following occurred:

Q. In the right rear corner is where Mr. Grose is, or was; is that correct?

A. That's my opinion, yes.

Q. Is that similar to the view—stop it just for a second. Is that, or the next one, similar to the view that Mr. Grose, or somebody if they looked out the window might have seen that tractor trailer approaching at that speed?

A. Not that one, but one we'll see subsequently was actually a better depiction of what kind of view he would have had if he looked back in the westwardly direction, or the direction in which the tractor was coming.

Q. **Understandable somebody may have said we're dead?**

A. **That would be understandable, yes.**

(emphasis added). This latter question and answer was significant in part because Tim Brazzle, who was in the passenger seat, had earlier testified that after the initial collision, he said: "we're dead."

Parts of the video were again played for the jury on redirect.

The use of demonstrative evidence is a question that is left to the sound discretion of the trial court. *Moore v. Missouri Pacific R. Co.,* 825 S.W.2d 839, 846 (Mo. banc 1992). An abuse of discretion exists only if the trial court's decision was clearly against reason and results in prejudice to the opposing party. *State v. Roberts,* 948 S.W.2d 577, 596–97 (Mo. banc 1997). This standard applies to films and videotape. *Shoemaker v. Ekunno,* 960 S.W.2d 527, 529 (Mo.App. E.D.1998).

■ The admissibility of a video depends on whether it is practical, instructive, and calculated to assist the jury in understanding the case. *Nash v. Stanley Magic Door, Inc.,* 863 S.W.2d 677, 681 (Mo.App. E.D.1993). Missouri allows videotapes into evidence for two essential purposes: (1) to re-create events at issue in the litigation and (2) to illustrate physical properties or scientific principles the average layperson would find difficult to understand and which forms the foundation for an expert's opinion. *Beers v. Western Auto Supply Co.,* 646 S.W.2d 812, 815 (Mo.App. W.D.1982). *Beers v. Western Auto Supply Co.* was the first Missouri case to address the admissibility of a video that fails to represent a substantially similar occurrence as that at issue in the trial. Looking to the case law in other states, the *Beers* court identified a number of factors useful in determining when to admit a video for the purpose of illustrating the general principles underlying an expert's opinion. First, the court should be confident that the film does not create the impression of re-enacting the accident. *Beers,* 646 S.W.2d at 815. Second, the court should determine, from viewing the film, that there is little potential for jury confusion regarding the purpose of the film. *Id.* Third, if the court admits the

video, it should be confident that the instruction it provides to the jury clearly indicates that the purpose of the video is *only* to establish a foundation for the expert's opinion and not to re-create the events at issue. *Id.* at 816. Fourth, the court should consider the need for the video whether the average layperson would have difficulty understanding the expert testimony in the absence of the visual aid, or whether other, less prejudicial evidence could be used. *Id.* In addition to these factors, the court should make a determination that the probative value of the video outweighs its prejudicial effect. *Olinger v. General Heating & Cooling Co.*, 896 S.W.2d 43, 48 (Mo.App. W.D.1994).

When the video is an attempt to re-enact the original event, the essential conditions in the video must be "substantially similar" to those existing at the time of the accident. *Id.; see generally,* 2 JOHN W. STRONG, ET AL., MCCORMICK ON EVIDENCE, at 20 (1999). Admissibility of a re-creation does not require perfect identity between the actual and the experimental conditions. *Nash,* 863 S.W.2d at 681; *see also Champeau v. Fruehauf Corp.,* 814 F.2d 1271, 1278 (8th Cir.1987). When, however, the video is offered merely to illustrate the principles used in forming an opinion, there is no requirement that the conditions portrayed in the video be substantially similar to those in the accident. *Beers,* 646 S.W.2d at 815; *see also Gilbert v. Cosco,* 989 F.2d 399, 402 (10th Cir. 1993). This does not mean that a video that fails to represent a substantially similar accident may automatically be admitted because it in some way "illustrates a principle." *See Phiropoulos v. Bi–State Development Agency,* 908 S.W.2d 712, 714–15 (Mo.App. E.D.1995).

Demonstrative evidence such as photos and videos appeal directly to the senses.

"This kind of evidence possesses an immediacy and reality which endow it with particularly persuasive effect." 2 MCCORMICK ON EVIDENCE at 3–4 (footnote omitted). This truth is captured in the familiar expression "a picture is worth a thousand words." If this is true it seems a moving picture, stopped and started at the convenience of the party staging the events seen in the video, may well be beyond valuation.

While demonstrative evidence may at times be invaluable in the court's search for the truth, it "remains the exception rather than the rule, and its use raises certain problems for a juridical system the mechanics of which are essentially geared to the reception of *viva voce* testimony by witnesses." *Id.* at 4. Because of the lasting visual impression photos, computer generated re-creations, movies and videos create in the mind, courts must exercise their discretion carefully when admitting them. Even footage or photos of an actual crime or accident are inadmissible when their probative value is outweighed by their inflammatory effect. *See, e.g., State v. Zeitvogel,* 655 S.W.2d 678, 683–85 (Mo. App. W.D.1983). Photos or videos showing one party's *staged re-creation* of those facts present an altogether different set of problems. As is aptly pointed out in MCCORMICK ON EVIDENCE:

> Here the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit or, if the film is subsequently deemed inadmissible, to expunge by judicial instruction.

2 MCCORMICK ON EVIDENCE at 19–20 (internal footnotes omitted).

One danger of staged re-creations is that there is ample room for the party

proposing the evidence to alter the conditions in subtle ways that favor its own case. *See Loevsky v. Carter,* 70 Haw. 419, 773 P.2d 1120, 1126 (1989). "Where that re-creation could easily seem to resemble the actual occurrence, courts have feared that the jurors may be misled because they do not fully appreciate how variations in the surrounding conditions, as between the original occurrence and the staged event, can alter the outcome." *Fusco v. General Motors Corp.,* 11 F.3d 259, 263–64 (1st Cir.1993). Not only do the differences between the staged and actual events have a potential to confuse jurors, those factual dissimilarities may render the evidence irrelevant. *Loevsky,* 773 P.2d at 1126.

■ Here, similarities between the actual and staged crash create the impression that the video is a re-creation of the accident. Nissan used the same make and model of car and essentially the same truck. *See McKnight v. Johnson Controls, Inc.,* 36 F.3d 1396, 1402–03 (8th Cir.1994) (finding that experiments conducted on batteries that were the same type and make as those involved in the accident "clearly were not limited to a demonstration of scientific principles in the abstract"). Nissan apparently attempted to hit the car at the same angle and speed as in the actual crash. Nissan's video even attempted to re-create the images that the occupants of the car may have seen in the last moments up to and including the crash. Finally, the conclusion that the Nissan video is a veiled attempt to re-create the accident is foregone in that Nissan initially attempted to introduce the video *as a re-creation* . Counsel for Nissan told the court that its expert would testify that the crash video "is substantially similar in all essential aspects as to the real accident."

Nissan's second argument that the video is merely an illustration of principles or concepts used in forming their expert's opinion is equally unpersuasive. "Scientific principles, when demonstrated in a fairly abstract way, are quite unlikely to be confused with the events on trial." *Fusco,* 11 F.3d at 264 n. 5. A "principle" is "a general or fundamental truth: a comprehensive and fundamental law, doctrine or assumption on which others are based or from which others are derived." Webster's Third New International Dictionary 1803 (1976). A concept is "a general or abstract idea ." *Id.* at 469. To illustrate the *general* principles behind "Delta V" and "G forces" it was unnecessary to use the *specific* make and model of car in the accident. *See McKnight,* supra. It was also unnecessary to use vehicles of the same weight or to have them collide at approximately the same angle and speed as the actual crash. It was certainly unnecessary, in illustrating the scientific principles underlying their expert's opinion, for Nissan to show the test crash from the perspective of someone riding in the hatchback area of the car, and then to ask the expert whether it would be surprising for someone back there to have said *"we're dead."* Importantly, Nissan's expert's testimony leading up to and during the playing of the video for the jury was confined almost exclusively to comparing the video with what he believed occurred in the actual accident. There is no discernible attempt to use the video to explain a "Delta V" or "G-force".

We find that the crash test is sufficiently close in appearance to the original accident so as to create a serious risk of misunderstanding by the jury. A juror listening to the foundation and subsequent testimony would be given the impression that, but for a few details, nearly impossible to reproduce, the video was a re-creation of the accident. There is here significant oppor-

tunity for the jury to confuse the test crash with the crash in dispute.

Next, Nissan argues that the instruction given by the court cleared up any confusion caused by the video. We find that it did not counter the impression that this video was a re-creation. The court instructed the jury that they should consider the video only "as a demonstration of the severity of an impact of a 78,000 pound tractor trailer hitting a stationary Nissan 300ZX at 23 miles per hour." Under this instruction the jury was not to consider the video as a "re-creation," but as a "demonstration" of the forces involved in a crash between almost identical vehicles at almost the same speed and angles. It is unrealistic to expect a juror to abstract from this video, which in many respects is similar to the actual crash, only the general principles of force involved. Nissan argues here for the creation of a third type of video admissible under Missouri Law, neither a re-creation nor an illustration of scientific principles but a hybrid of the two: in some respects the events in the video are very similar to the actual crash; but because of significant dissimilarities the video could not be admitted as a re-creation. So Nissan sought its admission under the rubric of a "demonstration." This demonstration is an improper marriage of a re-creation and an illustration of abstract principles and creates a significant opportunity for confusion.

■ The record is silent on the need for the evidence and the availability of other, less prejudicial evidence on the same issues. "When the need for the evidence is low and when alternative means to present the evidence exist, then prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence." *Lau v. Allied Wholesale, Inc.*, 82 Hawai'i 428, 922 P.2d 1041, 1049 (1996)(quoting 22 C. WRIGHT & K. GRAHAM,

FEDERAL PRACTICE AND PROCEDURE: EVIDENCE, § 5214 at 269 (1978)). The post-accident photos in this case show the crushed rear passenger side of the vehicle from which either party could base an argument on the force of the impact.

Finally, given the lasting visual impression the video was likely to create in the minds of the jurors, we are persuaded that admitting it into evidence and playing it for the jury prejudiced Grose. After seeing the video and hearing the accompanying testimony, the jury was very likely to be left with the visual impression of the hatchback flying open *despite having a restraining metal bar welded across the back of the hatchback.* The obvious inference the jury would draw from this image is that *no hatchback latch could sustain the forces involved in this crash*. Nissan's expert testified that the metal bar was welded on the back of the hatchback to "keep it from opening" and "distracting the jury." But this explanation reinforces precisely the inference that Nissan claims it was not attempting to induce; namely, that there was nothing Nissan could have done to keep the hatchback closed in this crash.

■ Technology such as the video in this case can be useful in the search for the truth. But it also poses significant dangers of abuse. Courts must proceed cautiously in admitting such potentially powerful and potentially misleading evidence. When admitting a video that re-creates the events at issue or illustrates the principles underlying an expert's testimony the court must make certain that the video actually serves the clear purpose for which it was admitted. Once admitted, the court should see that the proponent's use of the video faithfully tracks the purpose for which it was admitted.

Given that we find this video to be a "veiled attempt to successfully re-create the incident in question under controlled

conditions favorable to the party offering the evidence" (*Loevsky*, 773 P.2d at 1126), we are convinced that the prejudicial impact of the video significantly outweighs its probative effect. Because we do not find this error to be harmless, we reverse for a new trial against Nissan.

■ In his second point of error, Grose argues that the court erred in admitting testimony by Nissan's expert, Charles Strother, on velocities, energy and impact speed after the court ruled that a computer program he allegedly relied upon to produce these results was inadmissible. It is within the sound discretion of the trial court to determine the admissibility of expert testimony and we will not reverse unless there is a clear abuse of that discretion. *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991). While Strother testified that he made his initial estimates with respect to Delta Vs on the basis of a computer program the court found inadmissible, he testified that the estimates he gave at trial were based on standard engineering principles, and were arrived at independently of the inadmissible computer program. The trial court, after examining the witness, found this testimony believable. This finding is supported by the record. Point denied.

■ In his reply brief, Grose argues that the claims against State Farm and Scott Locker are so interrelated to and dependent on its claim against Nissan that a re-trial of its claim against Nissan necessitates a re-trial of its claims against State Farm and Locker. We disagree. Supreme Court Rule 84.14 mandates that: "No new trial shall be ordered as to issues in which no error appears." "Where the interests of parties to an appeal may be rightfully severed, where the errors do not affect the parties jointly, and where the rights of one party are not dependent upon those of another, judgment may be reversed as to one party and affirmed as to

other parties." *Brunk v. Hamilton–Brown Shoe Co.*, 334 Mo. 517, 66 S.W.2d 903, 905–06 (1933) (internal quotation and citation omitted). We "grant retrials of a separable issue alone where the error in a trial relates only to a certain issue which is in no way dependent for its proper trial on other issues, and where, as to such other issues, there was no error, and provided it is clear that a new trial on such separable issue will not work an injustice to any of the parties concerned." *Borgstede v. G.H. Wetterau & Sons Grocery Co.*, 116 S.W.2d 179, 182 (Mo.App.1938).

■ At the outset, we note that there is nothing inconsistent in the jury returning verdicts in favor of both Locker and State Farm. First, with respect to Locker's alleged negligence, there is evidence in the record to indicate that he was driving *below* the speed limit when he lost control of the car. There was also testimony that a passing truck sprayed water up and under the car, and that the draft caused by the truck sucked the car into a spin. This is sufficient evidence to support a jury conclusion that Locker was not at fault.

As to Grose's unidentified motorist claim against State Farm, it is undisputed that the truck immediately in front of Darold Hibler was driven by his father Ronald Hibler, not a party to this lawsuit. Darold Hibler's truck was the first to hit Locker's Nissan. There is evidence in the record to support a jury finding that Locker lost control of his vehicle because of a tractor trailer driven by Ronald Hibler and was then immediately struck by the truck driven by his son, Darold Hibler. There is, therefore, substantial evidence in the record to support the conclusion that an *identified* truck caused Locker to lose control of his vehicle.

Grose's claim that his suits against Locker, State Farm and Nissan are so interrelated that they require reversal is

unpersuasive. Grose alleged that Locker was negligent for failing to pay attention and/or driving at an excessive speed under the conditions. Grose sued State Farm on the theory that a phantom tractor trailer caused Locker to lose control of the vehicle. Each of these claims addresses the initial cause of Locker's vehicle going into a spin. Grose's claim against Nissan is that its hatchback latch mechanism was defective. The suit against Nissan focused on the forces involved in the first and second impacts and whether the design of the Nissan's latch mechanism was defective. The suit against Nissan is, therefore, unrelated to what caused Locker's car to go into a spin. The jury's finding that Locker was not negligent and that there was no phantom tractor trailer that caused the car to go into a spin are unrelated to the question of whether the latch mechanism on the Nissan was defective for failing to remain closed after the second impact.

We reverse against Nissan because the test crash video was inadmissible and prejudicial. However, the video begins with the car at rest and does not address the cause of Locker's loss of control. We therefore find that the claims against Locker and State Farm are not so related or interdependent that a retrial of Grose's products liability claim against Nissan requires retrying his claims against Locker and State Farm.

We affirm the jury's verdicts in favor of Locker and State Farm. We reverse and remand for a new trial against Nissan.

CLIFFORD H. AHRENS, P.J.,
Concurs.

WILLIAM H. CRANDALL, J.,
Concurs.