**Amanda M. SIMMONS, James Simmons, and Barbara Simmons,
Plaintiffs–Appellants,**

v.

**HEARTLAND WOOD PRODUCTS,
INC., Defendant–Respondent.**

**No. SD 30574.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 9, 2011.

Phillip J. Barkett, Jr., and Kathleen A. Wolz, Cook, Barkett, Ponder & Wolz, L.C., Cape Girardeau, MO, for Appellants.

Debbie S. Champion, and Dean A. Stark, Rynearson, Suess, Schnurbusch & Champion, LLC, St. Louis, MO, for Respondent.

GARY W. LYNCH, Judge.

Amanda Simmons, James Simmons, and Barbara Simmons[1] (collectively "Plaintiffs") appeal the trial court's judgment in their wrongful-death action entered after a jury verdict in favor of Heartland Wood Products, Inc. ("Heartland"). The jury assigned fault to both the decedent and the decedent's father, absolving Heartland of

---

1. Because many individuals involved in this case share a surname, we occasionally refer to such individuals by their first names to avoid confusion. No familiarity or disrespect is intended.

any liability in the decedent's death as a result of a construction accident. Plaintiffs claim that the trial court erred by admitting a video re-enactment of the accident by Heartland because it was not substantially similar to the actual accident and refusing to give the jury two withdrawal instructions proffered by Plaintiffs. Finding no merit in either claim, we affirm.

### Factual and Procedural Background[2]

 Lance Simmons worked for Mid–State Builders & Overhead Doors ("Mid–State"), a business owned and operated by plaintiffs James and Barbara Simmons, Lance's parents. Lance was part of a crew that was in the process of setting roof trusses on a building in Sikeston, Missouri, on February 13, 2006, when the truss upon which he was atop dropped out from under him and he fell, hitting his head on the concrete floor below. Lance died of his injuries the following day. In addition to his parents, he was also survived by his wife, plaintiff Amanda Simmons.

Plaintiffs filed a wrongful-death action against Heartland, the manufacturer of the truss. Plaintiffs alleged that the roof truss was designed, manufactured, sold, and distributed by Heartland and was defective in that the material used to manufacture the truss was of substandard strength and was not the wood designated in the design, facts which Plaintiffs alleged were known by Heartland. Plaintiffs brought five counts against Heartland: Count I—Negligence; Count II—Strict Liability (Product Defect); Count III—Strict Liability (Failure to Warn); Count IV—Negligently Supplying Dangerous Instrumentality; and Count V—Aggravating Circumstances.

Heartland denied all of Plaintiffs' allegations. Heartland further raised numerous affirmative defenses, including failure to state a claim upon which relief can be granted; the doctrine of comparative fault; failure to use a product as reasonably anticipated; failure to use a product as intended; voluntary exposure to known danger; failure to appreciate danger in planned use of product; failure to undertake reasonable precautions; failure to follow manufacturer's instructions and warnings regarding product use; failure to follow manufacturer's instructions and warnings regarding installation of product; Heartland was a seller in the stream of commerce as defined by statute; product was altered after purchase in such a way as to sever Heartland's potential liability; product was "state of the art" as defined by statute; James and Barbara Simmons, d/b/a Mid–State Builders & Overhead Doors, were liable as joint tort-

**2.** Both parties used and had admitted into evidence at trial a large number of exhibits that included several photographs and diagrams. The photographs and diagrams were used extensively with almost all of the witnesses to assist the trial court and the jury in understanding their testimony. We, however, were unable to gain a complete understanding of the testimony in this case for two reasons. First, Plaintiffs did not include any exhibits with the transcript or the legal file or deposit any exhibits with this Court as provided by Rule 81.16(a) and this Court's Special Rule 4. Where our review of the record required reliance upon an exhibit to understand a witness's testimony, we resolved any questions due to the lack of an exhibit in the light favorable to the trial court's ruling and unfavorably to Plaintiffs' position. *Rogers v. Hester ex rel. Mills*, 334 S.W.3d 528, 541 (Mo. App.2010). Second, even if the exhibits had been deposited, there are many instances in the testimony where witnesses indicate something particular in a photograph or diagram with a general reference such as "here" or "there" without any indication in the record as to specifically what or where in the exhibit the witness was making a reference. In such instances, we deferred to the trial judge's opportunity to view and understand queries and testimonial references to the photographs and diagrams, and we resolved any uncertainty accordingly. *Thomason Investments, LLC v. Call*, 229 S.W.3d 297, 300 (Mo.App.2007).

feasors for any liability assessed to Heartland because they failed to properly train and supervise the decedent in the use and installation of the product and failed to provide proper instructions, warnings, and safety precautions; the sole proximate cause of decedent's injuries was the conduct of Plaintiffs and decedent; any hazards associated with the construction involved were open and obvious; and the statute of limitations.[3]

At trial, James Simmons testified that, although he had never had any formal construction training, he had thirty-five years' experience building houses, and he opened his construction business, Mid-State, in approximately 1995. At the time of the accident, Lance was a supervisor for Mid-State and had worked for his father's company since he was twelve years old. Mid-State had done business with Heartland throughout the entire fifteen years of its existence, and James had done business with Heartland even before Mid-State's founding.

According to James, once the foundation of a house is poured, someone from Heartland visits the worksite to measure for the necessary trusses. A truss generally consists of two parts: the outer edges, or "chords," and internal braces, or "webs." A designer for Heartland takes the field measurements and, using a computer program, determines how many trusses are necessary and the appropriate measurements and composition of each. A "picker" for Heartland next chooses the appropriate lumber and gives it to a "sawyer." The sawyer cuts the wood to the correct specifications and gives it to a "fabricator,"

who actually builds the trusses. The trusses are then delivered fully assembled to the worksite complete with a packet of materials, which includes installation and bracing diagrams as well as recommended safety precautions and warnings. According to James, he and his crewmembers did not regularly go over the packet of materials because they "have it memorized."

The design created for the building in this case called for, in addition to other types, five "A2" trusses to be constructed using ten Dense Select Structural ("DSS")-grade boards in their bottom chords. It was later determined that eight of the ten boards were, instead, number two southern yellow pine, a generally weaker type of wood.[4] Although they were marked as such, no one from Mid-State was aware of the disparity in wood as no one from Mid-State inspected the trusses before beginning installation.

On the day of the accident, James and another individual began separating the trusses while the other crewmembers began straightening the walls to prepare for installation of the trusses. Straightening the walls involves installing braces to hold the walls and overhang straight, and the braces are typically left on until plywood sheeting is installed. Once the walls are straight, the first truss is put into position using a crane, and two other crewmembers—in this case, Nova Worley and Mike Boshell—nail the ends of the truss into the walls of the house. Each subsequent truss is first balanced by Lance attaching a board to the peak of the newly placed truss before it is nailed to the walls. On this particular occasion, Lance sat atop the

**3.** Heartland also raised numerous affirmative defenses to Plaintiffs' claim of aggravated circumstances and for punitive damages; that claim was decided against Plaintiffs before trial and is not appealed here.

**4.** There was evidence at trial that according to the Southern Pine Inspection Bureau, DSS-grade wood is 100% stronger than number two southern yellow pine, in terms of tension, and more than 100% stronger, in terms of bending.

peak of the truss, while Boshell was along the back wall, and Worley was along the front wall. James was in the front yard of the house and did not see Lance fall; rather, James heard someone yell and, when he looked up, saw Lance falling from atop the truss. When James reached Lance, Lance "was on the ground, unconscious, spitting up blood[.]" Nova Worley had also fallen from the truss, but he was conscious and alert. While James testified that he saw the larger part of the broken truss still attached to the back wall, with the smaller part hanging from the front girder, there was other testimony that the entire truss had detached from the wall and fallen to the ground, with the attaching nails, now bent, still in the wall. Photographs showed the bent nails.

While the design called for the truss to be attached to the front wall using a two-ply girder, James testified that Mid–State only used a one-ply girder. He further testified that, although hanger braces had been delivered with the trusses, it was Mid–State's customary practice to put the hangers on after the truss was already installed. According to James, "That's the way everybody I work for and everybody I know does it." The truss had been attached to the walls with three nails, which were lined up in a row; four nails is the customary method of attachment. Further, usual practice has the nails staggered, not in a straight line, because putting the nails in a straight line can split the wood. To James, it appeared that the bottom chord of the truss had broken from underneath where Lance sat. The bottom chord of that particular truss was made with the number two southern yellow pine, not the DSS-grade lumber as called for in the design.

Although James testified that customary practice would have involved placing a purloin brace against the bottom of the truss, photographic evidence indicated that no such purloin was in place against the truss in question. James subsequently equivocated his original response, stating that he was not exactly sure what bracing was being used because he was in the front yard. He also stated that not using the bottom purloin "would not be proper." James further admitted that he and his crewmembers had not followed a number of recommended safety precautions pertaining to the installation of the trusses, including—but not limited to—the method of hoisting the trusses, checking the trusses for conformity with the design specifications, use of a spreader bar during installation, properly fastening the trusses to multi-ply girders prior to lifting into place, and properly bracing the trusses during installation. At least one other crewmember also testified that braces were not being used.

Plaintiffs' expert, professor of wood science and forest production Dr. Rubin Schmulsky, testified that it was his opinion that the truss failed because of a knot, or weak point, in the bottom chord. Essentially, Dr. Schmulsky stated that the truss first broke at the knot in the bottom chord and then subsequently broke at other weak points when the weight of the truss and the individuals on it was transferred after the initial break. Dr. Schmulsky further testified that such a knot would not have been permitted in DSS-grade wood, and that no amount of bracing could have compensated for the weaker grade of wood. He later stated that a break anywhere in the bottom chord of the truss would cause the truss to collapse "[u]nless there's a wall underneath it, or something else holding it up."

Heartland's expert, engineer Kirk Grundahl, testified that, in his opinion, the best way to determine exactly what happened to the truss was "to simulate the exact

situation." To do so, Grundahl "looked at all the depositions and all the photographs[,]" and paid particular attention to Nova Worley's deposition. Some of the photographs relied upon by Grundahl were shown to the jury, including one showing that the truss fell straight down and another showing that only two nails had been driven through the plate at one end of the truss. Grundahl had Heartland select wood and cut pieces identical to the truss at issue in this case but, because of applicable shipping regulations, had a local company in Wisconsin—where the testing took place—assemble several replica trusses to Heartland's original specifications. Although the diagram created by Heartland specified DSS-grade lumber for the bottom chord, Grundahl used number two southern yellow pine so as to accurately reflect the actual truss in question. Grundahl then set up an identical truss system and installed and tested the truss in question in two different manners—simulating both Plaintiffs' proffered theory of what happened and his own observations of the scene—using "virtually identical" weight placed onto the truss. Grundahl testified that the temperature and humidity were irrelevant to what happened to the truss.

Grundahl testified that he chose to use two nails instead of three—as James Simmons testified were used on the truss—in reproducing the event because the photographic evidence indicated that only two nails were actually holding the truss to the wall. Grundahl reached this conclusion because the pictures showed two nails that were bent and one nail that was not; this was because the third nail had split the wood, leaving the other two nails to bear the entire weight of the truss.

During Grundahl's testimony and over objection, Heartland played for the jury the videotape of Grundahl's tests. In the first test, a truss was installed according to the recommended instructions and with a two-ply girder and a hanger on the wall end, holes were drilled in the bottom chord of the truss to simulate the knots in the wood at the same location as the two breaks in the bottom chord of the truss that fell,[5] weights were placed on top of the truss to simulate the workers on the truss that fell, and then the truss was cut at each drilled hole to simulate the breaks in the truss that fell. Even with the bottom chord of the truss completely severed and the weight of men on top, the truss remained securely attached to the wall; it did not collapse, but rather, the bottom chord remained fairly level. Next, Grundahl used an actuator to apply additional downward force to the top of the truss. As this force increased, the truss deflected down, but did not break. Grundahl testified that this first test was done to demonstrate why he believed the lower wood grade was not the cause of the truss falling and that, had proper bracing been used, the truss would not have fallen.

In the second test, Grundahl installed a truss in the same manner as the truss in question had been installed. This included using the same-sized nails and placing those nails in the same spots; Grundahl used two nails instead of three because the photographs indicated that only two nails were actually holding the weight of the truss. This test excluded the recommended bracing, as the testimony at trial indicated was done on the day of the accident. He then put two men on top of the truss to re-create the weight load of Lance

---

**5.** According to Schmulsky, "a knot is a weak point in the wood[.]" Grundahl's theory in drilling holes to simulate the knots was that by cutting a hole in it, "you take basically the full knot away." He concludes that because a hole obviously does not provide any strength to the wood, this is a "very conservative" approach.

and Nova Worley. The truss began to crack and the girder to loosen, and eventually the truss fell, sliding down the wall. After the fall, the nails used in the simulation bent similarly to the nails used on the truss at issue, indicating a similar slide. Grundahl repeated this particular test three more times, with the same result each time. Grundahl testified that this test led to his opinion that improper nailing caused the truss to slide off the girder, fall, and the bottom chord to break upon hitting the concrete floor below.

At the close of evidence, Plaintiffs proffered two withdrawal instructions, one dealing with bracing and the other with wind conditions the day of the accident; the trial court refused both proffered instructions. The jury ultimately returned a verdict in favor of Heartland, assigning James Simmons 50% fault and Lance Simmons 50% fault. This appeal timely followed the denial of Plaintiffs' motion for new trial.

### Discussion

Plaintiffs present two points for our review. We address them in the order presented.

### Admission of Video was not an Abuse of Discretion

In their first point relied on, Plaintiffs claim that the videotaped re-enactment of the accident, created by Heartland's expert witness, was improperly admitted over objection because the re-enactment was performed under conditions not substantially similar to those occurring at the time of the accident. We disagree.

 The admission "of demonstrative evidence is a question that is left to the sound discretion of the trial court." *Grose v. Nissan North America, Inc.*, 50 S.W.3d 825, 830 (Mo.App.2001) (*citing Moore v. Mo. Pac. R.R. Co.*, 825 S.W.2d 839, 846

(Mo. banc 1992)). An abuse of discretion occurs "when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *McGuire v. Seltsam*, 138 S.W.3d 718, 720 (Mo. banc 2004). This standard, while applicable to any type of demonstrative evidence, has been specifically applied to film and videotape. *Shoemaker v. Ekunno*, 960 S.W.2d 527, 529 (Mo.App.1998).

 "The admissibility of a video depends on whether it is practical, instructive, and calculated to assist the jury in understanding the case." *Grose*, 50 S.W.3d at 830. A videotape may be admitted into evidence for two reasons: "(1) to re-create events at issue in the litigation and (2) to illustrate physical properties or scientific principles the average layperson would find difficult to understand and which forms the foundation for an expert's opinion." *Id.* In the first instance—when a video is introduced to re-create the original event at issue—"the essential conditions in the video must be 'substantially similar' to those existing at the time of the" original event. *Id.* at 831 (quoting *Olinger v. General Heating & Cooling Co.*, 896 S.W.2d 43, 48 (Mo.App.1994)). "Substantially similar" does not mean identical. *Nash v. Stanley Magic Door, Inc.*, 863 S.W.2d 677, 681 (Mo.App.1993). Rather,

[t]he similarities must be in those circumstances or conditions as might supposedly affect the result in question; and the degree of similarity or difference should be judged in the light of the fundamental principle that any fact should be admissible which logically tends to aid the trier in determination of the issue. *Ward v. Penn Mutual Life Insurance Co.*, 352 S.W.2d 413, 425 (Mo. App.1961). In determining this question

of sufficient similarity, a substantial measure of discretion must be accorded to the trial judge. *Klaesener v. Schnucks Markets, Inc.,* [498 S.W.2d 555, 557 (Mo.1973)]; *Lietz v. Snyder Manufacturing Co.,* 475 S.W.2d 105, 107 (Mo.1972); *Lynch v. Railway Mail Association,* 375 S.W.2d 216 (Mo.App. 1964); *Ward*[, 352 S.W.2d at 425]. *Lawson v. Schumacher & Blum Chevrolet, Inc.,* 687 S.W.2d 947, 954 (Mo.App.1985). In the second instance, however—when a videotape is introduced as a means of illustrating certain principles used in forming an opinion—there is no "substantially similar" requirement. *Beers v. Western Auto Supply Co.,* 646 S.W.2d 812, 815 (Mo.App. 1982).

Heartland's videotaped testing consisted of two parts. In the first segment, Grundahl attempted to disprove Plaintiffs' theory that no amount of bracing would have prevented the truss from collapsing once the bottom chord broke; he thus constructed a truss identical to that which had fallen, attached it using a two-ply girder and a hanger brace as directed in the installation instructions provided by Heartland, and then cut the bottom chord. Plaintiffs do not challenge the admission of this portion of the videotape, but rather challenge the "videotaped re-creation of the failure of the truss."

In the second videotaped segment, Grundahl attempted to re-create the original event in order to determine what actually had caused the truss to fall. In this scenario, Grundahl constructed a truss identical to that which had fallen and attached it using a one-ply girder and using the same type of nails, nail patterns, and nail placements as used in attaching the truss in question. He then loaded the truss with weight equivalent to that which had been on the truss at the time it fell. Each time he attempted this configuration,

the girder loosened and the truss slid down the wall, bending the nails in a fashion similar to the nails in the truss at issue. This formed the basis of Grundahl's opinion that, at the time the truss at issue failed and Lance fell, the nails gave way and allowed the truss to slide down the wall; it further supported Grundahl's contention that the weaker lumber that had been used to construct the bottom chord of the truss was not the cause of the truss falling.

 The relevant inquiry regarding the admissibility of this second segment of videotape is not whether the conditions were exactly the same as those on the day of the accident but, rather, whether the conditions pertinent to the truss's failure were the same. *See Nash,* 863 S.W.2d at 681; *Lawson,* 687 S.W.2d at 954. Plaintiffs challenge four differences they claim impermissibly altered the testing conditions so as to render the re-enactment not substantially similar and, thus, inadmissible: the wood used in the bottom chord, the placement of the weight load, the number of nails used to attach the truss to the wall, and the temperature and humidity.

As to their first contention—the wood used—Plaintiffs argue that "because each piece of wood has unique properties based on its grain, it is not possible to accurately compare the manner in which any two pieces of wood will react to the same conditions." Plaintiffs therefore contend that the number two southern yellow pine in the bottom chord of the test trusses was not substantially similar to the number two southern yellow pine in the bottom chord of the truss in question. This contention is refuted by the testimony of Plaintiffs' own expert and, if correct, undercuts Plaintiffs' own theory of the case.

While Plaintiffs' expert, Dr. Schmulsky, testified that "every piece of wood is unique," he also went on to state two

sentences later within that same answer that "[w]e can basically just go by its design values of what it was supposed to hold." He further explained that design values are "the mechanical properties or the strength values that designers and builders and architects and engineers would use in choosing which grades of wood to use when they build something, whether they're floor joists or wall studs, rafters, or truss parts." Plaintiffs introduced and had admitted into evidence the Southern Pine Inspection Bureau's design values for number two and DSS southern yellow pine. Dr. Schmulsky relied upon these design values in arriving at his opinion that *any* DSS board used in the place of the number two board in the bottom chord of the truss at issue would have prevented the truss from falling. Because Dr. Schmulsky's testimony based upon those design values supported his opinion as to the substantial dissimilarity of *any* two pieces of wood from two different grades, such testimony supported Grundahl's use of those same design values in his video re-creation as to the substantial similarity of *any* two pieces of wood within the same grade. The grading process itself is necessarily and logically premised upon the ability to do both. It is hypocritical at best and disingenuous at worst for Plaintiffs to now argue otherwise.

■ The import of the remaining three alleged differences is refuted by the record via Grundahl's testimony that none of these factors had any impact on the re-enactment, i.e., the differences were not

"in those circumstances or conditions as might supposedly affect the result in question[.]" *Lawson,* 687 S.W.2d at 954. First, while Plaintiffs argue that "in Grundahl's testing, the man standing on the truss was in a position inconsistent with the testimony of all of the eyewitnesses[,]" Grundahl testified that variances, if any, in the placement of the weight on the test trusses did not affect the results of the re-enactment.[6] Second, as to the number of nails used in the tests, Grundahl testified that using two nails instead of three was more similar to the actual conditions at the time of the accident due to the third nail splitting the wood and being effectively removed from bearing the weight of the truss. Finally, Grundahl stated that the temperature and humidity at the time of the re-enactment had no bearing on the results and Plaintiffs point us to no contrary evidence in the record.

Because "a trial court is always 'free to believe none, part or all of the testimony of any witness[,]'" *Lau v. Pugh,* 299 S.W.3d 740, 756 (Mo.App.2009) (quoting *Ridgway v. TTnT Dev. Corp.,* 126 S.W.3d 807, 812 (Mo.App.2004)), Schmulsky's and Grundahl's testimony supports the trial court's decision to admit the video re-creation. In that context, we cannot say that such decision was clearly against the logic of the circumstances then before the court and was so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *See McGuire,* 138 S.W.3d at 720. Therefore, the trial court did not abuse its discretion

---

6. We were unable to compare the placement of the weight on the test trusses in the video with the placement as described by other testimony in the case for two reasons. First, Plaintiffs did not provide any specific page references to the transcript for the other testimony, as required by Rule 84.04(i). Second, and most important, Plaintiffs did not deposit the video exhibit with this court, as provided

by Rule 81.16(a) and this Court's Special Rule 4. When an exhibit is omitted from the transcript and is not deposited with the appellate court, "'the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant.'" *Stuart v. Ford,* 292 S.W.3d 508, 515 (Mo.App.2009) (quoting *In re Marriage of Gourley,* 811 S.W.2d 13, 16 (Mo.App.1991)).

in admitting the video. Plaintiffs' first point is denied.

### No Abuse of Discretion in Refusal to Submit Withdrawal Instructions

 In their second point relied on, Plaintiffs contend that the trial court erred in refusing to submit to the jury two proffered withdrawal instructions pertaining to a failure to brace and wind conditions, which Plaintiffs claim created false issues for the jury. A trial court's determination "whether to refuse a withdrawal instruction will not be disturbed on appeal absent an abuse of discretion." *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 129–30 (Mo. banc 2007). An abuse of discretion occurs "when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *McGuire*, 138 S.W.3d at 720.

 The purpose of a withdrawal instruction "is to avoid misleading and confusion on the part of the jury, because of some spurious issue raised by the testimony." *Weisbach v. Vargas*, 656 S.W.2d 797, 799 (Mo.App.1983). MAI 34.01 (6th ed.) states,

> A withdrawal instruction is only to be given when during the course of the trial a false issue, improper evidence, or evidence of an abandoned issue has been injected. The purpose of a withdrawal instruction may be served by the court sustaining a motion to strike and admonishing the jury to disregard the evidence. However, in certain instances, the trial court may determine that such action is inadequate, inappropriate or untimely and that a written instruction is necessary.

The court may properly give a withdrawal instruction when it has received evidence upon an issue which is later abandoned either by choice or by reasons of inadequate proof for final submission to the jury. The instruction to be given is that the issue is no longer open for the jury's consideration.

Evidence, rather than an entire issue, may also properly be withdrawn by instruction. In the event evidence, rather than an issue, is sought to be withdrawn from the jury's consideration, care must be taken that such evidence does not also concern an issue still before the jury.

Here, Plaintiffs argue that the issues of whether a failure to properly brace the truss and/or the wind contributed to Lance's death were improperly before the jury because "there was no evidence that failure to brace or the wind conditions at the time of the incident had any causal connection to the failure of the truss[.]" We disagree.

Section 537.760 [7] defines a product liability claim as a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) *The product was used in a manner reasonably anticipated;* and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

---

**7.** All statutory references are to RSMo 2000.

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

(Emphasis added). It was, thus, Plaintiffs' burden to demonstrate that the truss at issue was used "in a manner reasonably anticipated." Heartland's defense—that the construction crew of Mid–State, including both Lance and James Simmons, failed to follow expected safety procedures—was a direct response to this element of the charge. The use, or lack thereof, of proper bracing and the wind conditions present at the time the trusses were being installed are both concepts that fall within the sphere of whether the truss was used in a reasonably anticipated manner, i.e., whether proper safety precautions—bracing—were followed, given the wind conditions at that time. Thus, evidence regarding bracing and the wind pertained to and were woven into a separate issue before the jury and, according to MAI 34.01, it would have been error for the trial court to withdraw either from the jury's consideration.

Moreover, contrary to Plaintiffs' argument, there was expert testimony implicating the failure to brace as a causal factor in Lance's death. Heartland's expert, Grundahl, testified that, had the appropriate bracing been in place, the truss would not have failed:

Q. Sir, do you have an opinion as to whether or not, if any hanger and a two-ply girder had been in place, when he nailed this in, whether this truss would have failed?

A. It would not have failed. I mean, we use hangers for safety in this case.

Q. Would that end nail connection, could it have failed, if the hanger was in place?

A. No.

This testimony followed multiple admissions by James Simmons that his crew had not installed the bracing as recommended by Heartland. There were also numerous comments made by witnesses for both parties regarding the wind conditions that day, including one comment that goes directly to the impact wind conditions would have on the trusses during installation;[8] while this is not expert testimony, it demonstrates that wind conditions are a relevant concern in regard to safety and the installation of trusses.

Ultimately, whether appropriate bracing was used and whether the wind conditions were such that truss installation was appropriate were relevant sub-issues contained within the larger issue of whether the truss was used in a reasonably anticipated manner. We find no abuse of the trial court's discretion in refusing to give either proffered withdrawal instruction. Plaintiffs' second point is denied.

### Decision

The trial court's judgment is affirmed.

BURRELL, P.J., and RAHMEYER, J., concur.

---

8. Ronald Palmer, a Mid–State crewmember who worked at the jobsite the day of the accident, testified, "A little bit of wind and them long trusses[,] they'll just fold.... I've had one do it. A gust of wind come up and folded it in half."