Richard M. MOORE, Plaintiff–Appellant,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, Defendant–
Respondent.

No. 73587.

Supreme Court of Missouri,
En Banc.

Feb. 25, 1992.

Rehearing Denied March 24, 1992.

Leonard P. Cervantes, St. Louis, Norman Jones, Houston, Tex., for plaintiff-appellant.

William Guerri, Michael D. O'Keefe, Dan H. Ball, Patrick J. Hagerty, St. Louis, for defendant-respondent.

ROBERTSON, Chief Justice.

We granted transfer in this case to consider two questions of general interest: First, whether evidence of collateral source payments is admissible in a Federal Employers' Liability Act (FELA) case where such evidence is volunteered by the plaintiff in a nonresponsive answer on cross-examination; and second, whether testimony regarding a routine diagnostic examination of plaintiff requested by the defendant's medical expert and administered by a physical therapist is within the scope of Rule 60.01.

The trial court answered both of these questions in the affirmative. The Court of Appeals, Eastern District, in a sharply divided en banc decision, reversed the judgment of the trial court and remanded for a new trial. Our jurisdiction rests on Mo. Const. art. V, § 10. We affirm the judgment of the trial court.

I.

Since 1959, Missouri Pacific Railroad (MOPAC) had employed plaintiff Richard Moore. On the date of his injury, July 29, 1985, Moore worked as a signalman for MOPAC in its North Little Rock, Arkansas, rail yard.

Not surprisingly, Moore and MOPAC hold antithetical views of the case. Moore contends that he suffered a work-related injury as he began his shift at approximately 11:00 p.m. on July 29, 1985. Moore testified that upon arrival at the rail yard, he immediately proceeded to the master retarder. There, he used an intercom to contact the retarder operator to inform the operator that he, Moore, intended to check the retarder without first stopping by the retarder building.

The master retarder stands approximately three to four feet above the ground. It slows rolling railroad cars as they move during the switching process in the rail yard. On a given day as many as 3,000 cars pass over the master retarder. These spill oil and grease on and around the retarder. Thus, the retarder area normally suffers from an accumulation of lubricating substances.

Moore began the inspection. As he climbed the retarder, he slipped and fell to the ground, a distance of approximately four feet, and injured his back. He claims permanent injury that will prevent his return to work.

MOPAC contended that Moore's entire claim was fraudulent, concocted to provide Moore with economic sustenance should he lose his job due to his poor performance.

Moore's supervisor testified that he, the supervisor, attempted to contact Moore throughout the day prior to the injury to inform Moore of his temporary suspension from his job for poor performance. Both the supervisor and the supervisor's secretary testified that they spoke to a person whose voice they recognized as Moore's,

but who nevertheless denied being Moore. They informed this person that Moore need not report to work due to the railroad's disciplinary actions. Moore denied receiving any telephone calls informing him of the disciplinary action. Moore testified that he had been in Hot Springs, Arkansas, July 29, visiting his mother who had undergone surgery there.

MOPAC introduced evidence that Moore normally reported to the retarder building before beginning his shift. On the night of the injury, however, Moore did not report to the retarder building; instead he went immediately to the master retarder where he fell on the oil and grease normally accumulated there.

No one witnessed the fall. Persons arriving shortly thereafter testified that Moore climbed out of the retarder area unassisted and walked to his Volkswagen van, which he started by pushing it down an incline and "popping" the clutch. Moore drove to the equipment building and began filling out an accident report. Several minutes later, however, he took a cab to the hospital, leaving the report unfinished. The hospital provided Moore with pain medication and an appointment to return the next day for x-rays. Moore left the hospital, returned to the railroad's equipment building and finished the accident report.

Moore's orthopedic surgeon in Arkansas, Dr. Ashley Ross, diagnosed a lumbo-sacral sprain and advised Moore that he would need approximately six weeks to recover. Ross believed that Moore would be able to return to light or medium work on October 8, 1985. However, Moore's complaints about his back continued past that date, and he did not return to work.

Moore's attorney counseled Moore to come to St. Louis, Missouri, where the attorney arranged an appointment with a neurosurgeon of the attorney's choosing. The St. Louis neurosurgeon, who was partially retired and who testifies on behalf of plaintiffs approximately fifty times each year, examined Moore and performed a procedure known as a facet rhizotomy. A facet rhizotomy is an invasive, outpatient procedure designed to relieve back pain by heating nerve fibers. The St. Louis doctor performed the procedure twice. Although Moore experienced some relief after each procedure, he continued to need pain medication. Evidence at trial indicated that no other physician in either Little Rock or St. Louis performs a facet rhizotomy; expert opinion places the efficacy of a facet rhizotomy in considerable doubt.

Prior to trial, Dr. Michael Winer, an orthopedic surgeon in St. Louis, examined Moore for MOPAC pursuant to Rule 60.-01(a). Winer directed Moore to a physical therapist in an adjoining office for a routine diagnostic procedure performed on an Isostation B-200 (B-200). The B-200 utilizes nautilus-type exercise equipment connected to computers to measure strength and range of motion. Dr. Winer uses the information provided by the B-200 to provide an objective measure of inconsistent levels of effort involved in identical movements for purposes of determining the existence and degree of injury. A physical therapist at the Spine Rehabilitation Center administered the B-200 procedure. Dr. Winer is the medical director of that center. As a result of his examination and testing, Dr. Winer found no objective signs of injury to Moore's back.

Prior to trial, Moore's counsel filed a motion in limine to exclude evidence of Moore's receipt of collateral benefits. Defense counsel agreed not to broach the subject unless plaintiff injected it. During cross-examination of Moore by MOPAC counsel, the following exchange took place:

Q: (By defense counsel) Dr. Evans [a Little Rock physician] doesn't really treat you, does he? He examines you and gives you pills; isn't that what he does for you?

A: He sent me to a therapist and then I went to a back school that he sent me to.

Q: When was the last time he sent you to a therapist?

Q: Back in 1985?

A: I don't know. At the therapy place, they said we could no longer cover your expenses.

Q: Who could no longer cover your expenses?

A: It wasn't in '85, I don't believe.

Q: So, you couldn't go back to the therapy place because of your expenses?

A: They wouldn't do anything unless I gave them cash, and I didn't have any money.

Q: You don't have any money, is that what you are telling me?

A: What do you mean by money?

Q: You are saying you couldn't go back there because you couldn't afford it?

A: Yes, sir, I couldn't afford it.

The trial court ruled that Moore had injected the issue of his financial condition during cross-examination. Over Moore's objection, the court permitted defense counsel to inquire as to Moore's receipt of collateral source payments. Moore went on to testify in response to cross-examination that he received $1,070 per month from the Railroad Retirement Board, $200 from CNA Insurance Company, and loans of $500 per month from his attorney. All of this testimony was permitted by the trial court over Moore's counsel's objections.

Moore offered evidence that the present value of his past and future lost earnings totaled $386,049. The jury returned a verdict for Moore for $5,105, the exact amount of his lost wages between July 29, 1985, and October 8, 1985. Moore appealed.

## II.

*Eichel v. New York Central R.R. Co.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1962), announced a general rule that evidence of collateral source payments is inadmissible to impeach the plaintiff as to his motive for refusing to work or as to the permanence of his injuries in a FELA case. *Eichel* reasoned that "misuse by the jury clearly outweighs the value of this evidence.... Moreover, it would violate the spirit of the federal statutes if the receipt of disability benefits ... were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act." *Id.* at 255, 84 S.Ct. at 317.

*Gladden v. P. Henderson & Co. v. Lavino Shipping Co.,* 385 F.2d 480 (3rd Cir. 1967), and *Lange v. Missouri Pacific R.R. Co.,* 703 F.2d 322 (8th Cir.1983), recognize an exception to *Eichel's* general rule of inadmissibility, permitting evidence of collateral source payment if the plaintiff voluntarily injects the issue into the lawsuit. In *Gladden,* the plaintiff volunteered testimony on direct examination that he did not return to his doctor because "my bills got behind and when I went back to work, that was one of the main reasons I went back to work, was to try to catch my bills up and support my family." 385 F.2d at 482. *Gladden* held that the defendant was not required to leave this testimony unchallenged. "The barriers which have been created against the admission of otherwise relevant evidence because of its prejudicial effect do not extend to the affirmative volunteering by a plaintiff of testimony which breaks into this restrictive area." 385 F.2d at 483–84.

In *Lange,* the Eighth Circuit considered a case in which defense counsel objected to plaintiff testifying on direct examination that he was required to return to work immediately after back surgery because he had no savings or disability income. The trial court permitted cross-examination of the plaintiff after plaintiff injected the issue into the case. On cross-examination, the defendant elicited testimony from the plaintiff that he had settled a workers' compensation claim for a lump sum payment. This evidence rebutted testimony on direct examination of financial distress as a motive for immediately returning to work. On appeal, the Eighth Circuit affirmed the trial court's admission of this evidence of collateral source payments.

Both *Gladden* and *Lange* involve financial condition testimony voluntarily injected by plaintiff on direct examination. In this case, plaintiff volunteered information regarding his financial condition in a non-responsive "answer" to defense counsel's cross-examination. There is no functional distinction between the plaintiff injecting his dire financial condition on direct examination or on cross-examination. In

either case, the plaintiff makes the jury aware of his financial condition in connection with a failure to obtain treatment or in an attempt to obtain sympathy. Whether the plaintiff injects his financial condition through inadvertence or purposefully, it is the raising of plaintiff's financial condition with the jury that permits the opposing party to attack his claims of financial distress by showing that other financial assistance was available.

Here the trial court determined that Moore had injected the issue of his financial condition on cross-examination. The permissible scope of cross-examination is left to the sound discretion of the trial court. We will reverse only where that discretion is abused. Finding no abuse of discretion, we find no error in the trial court's ruling. The point is denied.

### III.

We next consider whether testimony regarding a routine, diagnostic evaluation of plaintiff requested by the defendant's medical expert and administered by a physical therapist was properly admitted as within the scope of Rule 60.01.[1]

Rule 60.01(a) provides in pertinent part: In an action in which the ... physical condition ... of a party ... is in controversy, the court in which the action is pending may order the party to submit to physical ... examinations *by a physician....*

[Emphasis added.] Moore contends that Rule 60.01(a) is limited to examinations by a physician. Under Moore's reasoning, an examination by any medical technician other than a physician is outside the scope of Rule 60.01(a). MOPAC posits that the word "physician" in the rule necessarily includes examinations and tests performed by medical technicians deemed necessary by the physician for the diagnosis or evaluation of a party's condition.

Sophisticated diagnostic equipment and specialized tests have become the norm in medical diagnosis. Without blood tests, CT-scans, urinalysis, and x-rays, for example, a physician's ability to diagnose the presence and extent of illness or injury is severely compromised. These tests are often performed outside the examining physician's office by non-physician technicians as a cost-effective division of labor. While the interpretation of the results remains the task of the physician, the test itself need not be performed by a physician or even by his employee. *See Little v. Howey,* 32 F.R.D. 322, 323 (D.C.Mo.1963).

▪ To follow Moore's cramped reading of Rule 60.01(a) would be to deny the fact-finding process the benefit of diagnostic tests upon which physicians regularly rely to complete their examination and arrive at a conclusion about the nature and extent of claimed injuries. Thus, we hold that a physical examination performed by a non-physician will be within the purview of Rule 60.01 if it is (1) requested by the physician designated under Rule 60.01 and (2) a diagnostic or medical procedure or service that in the regular course of his or her medical practice the physician would customarily provide for a regular patient who has symptoms or complaints similar to those evidenced by the party ordered by Rule 60.01 to submit to a physical examination.

▪ The physical condition of the plaintiff's back is clearly in controversy in this case. The B–200 examination provides an objective measurement of strength and range of motion. Dr. Winer's extensive use of this diagnostic tool for his regular patients and the tool's general medical acceptance were both established at trial. Moreover, the B–200 is customarily used in Dr. Winer's medical practice as a diagnostic tool to assist him in the diagnosis and treatment of patients who have back ailments of the nature evidenced by Moore.

Because we hold that this medical procedure requested by Dr. Winer is within the purview of Rule 60.01, it follows that the

1. The medical examination of the plaintiff was not performed pursuant to a court order. Although parties are free to agree to any examination they mutually desire under Rule 60.-

01(b)(3), it was conceded by defendant that the examination would be limited to that which could be ordered by the trial court. Thus, our review is similarly restricted.

expert testimony of the physical therapist concerning the operation of the B–200 machine was also properly admitted. The physical therapist was recognized as an expert by the trial court in the operation of the B–200. The test performed by the B–200 was clearly within the scope of his recognized expertise. The technician offered no opinion as to Moore's physical condition. He testified only with respect to the operation of the machine and the accuracy of the data provided to Dr. Winer. Dr. Winer was left the task of interpreting the medical significance of the B–200 results. The point is denied.

## IV.

■ When we accept transfer, the entire appeal comes before the Court. We turn now to consider Moore's remaining points on appeal.

### A.

Moore assigns error to the trial court's failure to declare a mistrial *sua sponte* during defense counsel's closing argument. Moore characterizes that argument as improper and prejudicial. Moore's counsel offered no objection to the argument at trial. Thus, our review is under plain error, and we will reverse the trial court only if we find that a "manifest injustice or miscarriage of justice has resulted." Rule 84.-13(c).

During closing argument, defense counsel reiterated his contention that plaintiff's cause of action was premised upon fraud. In furtherance of that stated premise, defense counsel asserted that Moore could not find a physician in Little Rock who could find any permanent injury. Consistent with this theory, defense counsel noted that only by coming to St. Louis to meet with his attorney's chosen doctor could Moore find any physician willing to testify that his, Moore's, injuries were permanently disabling. These were defense counsel's words:

> Ask him [plaintiff's attorney] why, when Dr. Ross said "Go back to work on October 8th, 1985," why he couldn't find a doctor … anywhere in Little Rock but

had to send him [Moore] all the way up to St. Louis. …

\* \* \* \* \* \*

> [A]sk him why the case is here in the first place, why isn't it in Little Rock where Mr. Moore lives, where he could try it in front of jurors who are his neighbors who might know what he does every day? If any of you got hurt working for the Missouri Pacific Railroad, would you go down to Little Rock to sue them? … It is here because Mr. Jones [plaintiff's counsel] thinks he can come up to St. Louis and hoodwink—I mean flimflam you 12 jurors from St. Louis into giving a verdict for loss of money against a railroad … to give a huge award against the railroad.

As we have previously indicated, Moore's counsel offered *no* objection to this argument.

■ We begin with the proposition that counsel is traditionally given wide latitude to suggest inferences from the evidence on closing argument. *Carter v. Liberty Equipment Co., Inc.*, 611 S.W.2d 311, 315 (Mo.App.1981). Even where opposing counsel proffers the here-absent objection, the trial court is accorded broad discretion in ruling on the propriety of a closing argument to the jury and will suffer reversal only for an abuse of discretion. This is so "even though the inferences drawn are illogical or erroneous." *Eickmann v. St. Louis Public Service Co.*, 323 S.W.2d 802, 810 (Mo.1959).

■ Moore's counsel first raised the issue in his closing argument, postulating, "And I don't know why he [Moore] was criticized for coming up to St. Louis, Missouri, to see a doctor." In response, MOPAC's counsel asked the jury several questions in an attempt to raise doubt concerning Moore's care.

The questions asked of the jury by defense counsel in closing argument and the inferences they raise as to the presence of the case in St. Louis were germane to MOPAC's theory of the case and the nature and extent of Moore's injuries. The evidence before the jury was that Moore's

treating physician in Little Rock found no permanent injury; indeed that doctor testified that Moore could return to work. Only the St. Louis doctor arranged by Moore's attorney would testify as to the permanency of Moore's injury. Moore's counsel opened the door to defense counsel's argument. There is no error in the trial court's failure to interrupt the argument.

Defense counsel's second argument is also supported by the evidence and is responsive to Moore's closing statement. During his cross-examination of Moore's supervisor, plaintiff's counsel asked Moore's supervisor to "[l]ook at the jury and tell them he [Moore] was a fake and fraud." The supervisor replied, "He was a fake and fraud." Finally, during his closing argument Moore's counsel again raised the fraud issue, saying, "I have seen people go out and fake injuries.... I can think of a better way to do it than fall inside a retarder that switches cars."

In response, defense counsel described the case as an attempt by Moore to "hoodwink" and "flimflam" the jury. These are strong characterizations. They describe a well-planned scheme to deceive other persons by hiding the truth. However, these words accurately reflect defendant's theory of the case and are a reasonable inference that can be drawn from the evidence before the jury. Indeed, Moore's counsel apparently realized that a jury might reasonably draw such an inference; nothing else explains his effort in closing argument to persuade the jury that Moore did not "fake" his injury. Where there is evidence to justify an inference and plaintiff's counsel seeks to blunt it, defense counsel is permitted to draw the identical inference and sharpen it for his purposes.

■ Out of an abundance of caution, we firmly reiterate this Court's intolerance for arguments designed to appeal to local prejudices. "When there is no evidence to justify it is always improper for counsel to indulge an argument to the jury which tends towards the prejudice of one party or to the undue sympathy for the other." *Calloway v. Fogel*, 358 Mo. 47, 213 S.W.2d 405, 409 (1948). In this case, there was ample evidence to justify defense counsel's remarks. The point is denied.

## B.

Moore contends that the trial court erred in excluding his proffered testimony of prior slip and fall incidents at the retarder site and in permitting the defense to offer evidence of the absence of previous, similar incidents in the retarder area. Moore assigns further error to the trial court's exclusion of expert testimony concerning the cleaning of the master retarder.

Each of these assigned errors focuses on evidence designed to show MOPAC's liability under FELA for Moore's injuries. Even if we assume for the sake of argument that the trial court erred in these rulings, reversal would not be required. The jury decided the liability issue in Moore's favor, apparently accepting Moore's contention that he slipped and fell on accumulated lubricating substances in the retarder area. The jury's verdict in Moore's favor renders Moore's complaints about these evidentiary rulings moot.

## C.

Moore next argues that the trial court erred in admitting into evidence a photograph of his residence showing his vehicles and well-kept home during cross-examination of Mrs. Moore.

Both Moore and his wife testified on direct examination concerning their vehicle ownership, Moore's difficulty in maintaining his house and yard, and his use of an attached workshop. During cross-examination, defense counsel offered an 8″ × 24″ photograph of the Moores' home. Moore's counsel objected on the grounds of relevance and prejudice. MOPAC argued that the photograph was offered to show the house, vehicles, and workshop that were previously described by Mr. and Mrs. Moore in their testimony. The trial court overruled the objection. Moore suggests on appeal that MOPAC intended the photograph to inflame the passions and prejudices of a jury composed primarily of working class and poor persons whose posses-

sions were (he speculates) not as substantial as the Moores'.

The use of demonstrative evidence is a matter left to the sound discretion of the trial court. *McCutcheon v. Cape Mobile Home Mart*, 796 S.W.2d 901, 907 (Mo.App.1990); *Fravel v. Burlington Northern R.R.*, 671 S.W.2d 339, 342–43 (Mo.App.1984), *cert. denied*, 469 U.S. 1159, 105 S.Ct. 907, 83 L.Ed.2d 921 (1985). So long as the evidence has a proper foundation, is relevant and is not prejudicial, the discretion of the trial court will not be disturbed. *Fravel*, 671 S.W.2d at 343. Here, the photograph is relevant to the direct testimony of the plaintiff and his wife; it provided no more than a visual representation of the verbal statements made by Mr. and Mrs. Moore; it does not unduly arouse antipathy against the plaintiff; and it was properly authenticated by plaintiff's wife as a true and accurate portrayal of the Moore's home. The point is denied.

### D.

Next, Moore claims that the trial court erred in prohibiting his counsel from requesting a specific dollar amount for pain and suffering during the rebuttal portion of his closing argument.

During the opening portion of his closing argument, Moore's counsel asked the jury to award Moore his past and future lost earnings of $386,049. Counsel also noted that Moore's pain and suffering should be compensated but failed to mention a specific dollar amount. During his portion of closing argument, MOPAC's counsel limited his discussion to the issues of liability and economic loss, making no mention of pain and suffering.

Before plaintiff's rebuttal, defense counsel requested the trial court to prohibit plaintiff's counsel from mentioning a specific monetary figure for pain and suffering damages on rebuttal. Defense counsel reminded the court that Moore had only argued specific monetary damages for economic loss in his opening argument and that defense counsel had not discussed pain and suffering at all during closing argu-

ment. The trial court sustained defendant's motion.

The standard of review is abuse of discretion. *Shaw v. Terminal R.R. Assoc. of St. Louis*, 344 S.W.2d 32, 36 (Mo.1961). We find no basis for holding that the trial court abused its discretion in limiting plaintiff's rebuttal argument where, as here, the defendant chose not to argue the pain and suffering issue on its portion of the closing argument. The trial court's ruling permitted plaintiff's general claims for pain and suffering damages to lie before the jury unchallenged and unopposed. The trial court had the advantage of participating in the flow of the trial, hearing the arguments, and observing the jury's reactions. On this record, we cannot say that the trial court abused its discretion in limiting plaintiff's rebuttal. The point is denied.

### E.

Finally, Moore asserts that the inadequacy of the jury's verdict warrants the conclusion that the jury decided the case on the basis of bias and prejudice and demands a new trial. Again, we disagree.

The jury fixed Moore's damages at $5,105, an amount that exactly matched Moore's lost wages from the date of injury until Dr. Ross, his treating physician, released him to return to work. In fixing damages in this amount the jury was required to believe that Moore suffered a job-related injury as a result of MOPAC's negligence, that as a result of that injury Moore could not resume work until October 8, 1985, that Moore's injuries were not permanent, and that after October 8, 1985, Moore could have returned to work. These conclusions are supported by the evidence and are reasonable.

The assessment of damages by a jury will not be reversed if there is substantial evidence to support that verdict and "[i]f the damages were returned on any rational assessment of the evidence." *Denney v. Milgram Food Stores, Inc.*, 614 S.W.2d 323, 324–25 (Mo.App.1981). Moore's complaint that the jury chose to

believe MOPAC's theory of the case provides no basis for reversal.

### V.

The judgment of the trial court is affirmed.

COVINGTON, HOLSTEIN, BLACKMAR, BENTON and THOMAS, JJ., concur.

RENDLEN, J., concurs in result.