

# In the
# Missouri Court of Appeals
# Western District

MICHAEL RAY THOMAS,

              Appellant,

v.

HARLEY-DAVIDSON MOTOR
COMPANY GROUP, LLC,

              Respondent.

**WD81329**

**OPINION FILED:**

**APRIL 2, 2019**

---

**Appeal from the Circuit Court of Saline County, Missouri**
**The Honorable Dennis Allen Rolf, Judge**

**Before Division Three: Mark D. Pfeiffer, Presiding Judge, Lisa White Hardwick, Judge,**
**Anthony Rex Gabbert, Judge**

Michael Thomas appeals the circuit court's Judgment entered after a jury verdict finding in favor of Harley-Davidson Motor Company Group, LLC, on Thomas's Petition for Damages for Personal Injury. Thomas contends the circuit court, 1) abused its discretion in admitting Exhibit RR into evidence because it was neither logically nor legally relevant and was prejudicial to Thomas, 2) abused its discretion in refusing to admit Exhibits 1, 10, and 11 because the exhibits were not hearsay and constituted admissions by Harley-Davidson, and 3) erred in overruling Thomas's motion for new trial. We affirm.

**Factual and Procedural Background**

On September 2, 2006, Thomas was injured when his 2003 Harley-Davidson Ultra Classic Electra Glide motorcycle went off a curve on Highway YY in Saline County, Missouri. Thomas believed the accident was due to a design defect in the motorcycle and filed suit against Harley-Davidson in a three-count petition. In Count I he alleged strict product liability for design defect, manufacturing defect, and failure to warn. In Count II he alleged negligence. In Count III he alleged breach of express and implied warranties of merchantability and violation of the Missouri Merchandising Practices Act.

The case was tried before a jury on August 16 and 17, 2017. Thomas offered the testimony of Master Sergeant Ryan Smith of the Missouri Highway Patrol. Smith investigated Thomas's accident and completed a report. Smith testified that it was daylight at the time of the September 2006 crash and the pavement was dry. Smith was familiar with Route YY due to his responsibilities in patrolling that road. He testified that the section where the crash occurred was curvy. From his investigation, he believed the motorcycle left the roadway seventy-five feet south of the 304 and Highway YY intersection and came to rest fifteen feet north of the intersection after hitting an embankment. Thomas was either lying or sitting on the ground when Smith arrived and Thomas told Smith, "I ran off the road, I don't know why." Smith testified that if Thomas had told him there was a problem with the motorcycle, he would have included that in his report. Further, if there had been tire marks on the roadway, those would have been noted.

Larry Yeager, owner of Yeager Cycles, also testified for Thomas. Thomas purchased his motorcycle from Yeager three years prior to the accident. At the time Thomas purchased his motorcycle, it would have been shipped from Harley-Davidson crated, with no assembly beyond

mirrors, antenna, and windshield required. Yeager Cycles serviced Thomas's motorcycle at 1,000 miles, 5,000 miles, and 10,000 miles.

Gregory Billingsley, Thomas's uncle, testified that on September 2, 2006, he was scheduled to meet Thomas in Marshall, Missouri at noon. The two planned to ride down to a bike rally in south Missouri. Thomas called Billingsley at about noon and said that he was on his way but running late. Billingsley owned a motorcycle nearly identical to Thomas's. Billingsley purchased his used with 34,999 miles, and at the time of trial it had 80,000 miles. Billingsley was completely happy with his motorcycle and had no complaints regarding its handling or stability. After Thomas's wreck, Thomas encouraged Billingsley to get rid of his motorcycle because Thomas believed it was unsafe. Billingsley testified that he really enjoyed his motorcycle so, to address Thomas's concerns, he purchased a device that mounts below the transmission and attaches to the motor and frame. Billingsley noticed no difference with the motorcycle after the device was installed, and as far as he knew, the device did nothing.

William Smith, an employee of Yeager, testified for Thomas as well. He testified that he was a technician at Yeager who worked on all models of motorcycles, including Harley-Davidson motorcycles. He received ongoing training regarding maintenance and repair of Harley-Davidson motorcycles. He testified that the engine and transmission on Thomas's motorcycle is stabilized to the frame through a rubber mount which attaches to a swing arm. At Thomas's motorcycle's 10,000 mile checkup, which was performed at 11,000 miles, the front engine mount on the motorcycle was in good shape.

In support of Thomas's case, portions of deposition testimony of Bjorn Christensen were read into evidence. Christensen was an engineer employed by Harley, tendered by Harley as an expert, and deposed by Thomas. Christensen testified that misalignment of tires on motorcycles

3

can cause "offset tracking of vehicle" and "irregular tire wear." Irregular tire wear can lead to a slight pull of the vehicle to one side. He testified that there was a slight misalignment of the wheels on Thomas's motorcycle, but considered the alignment within acceptable limits. Christensen stated that he did not believe the offset on Thomas's motorcycle would have had any effect on the handling of the motorcycle, and was not enough "to have any impact on this incident." He was aware the service manual for Thomas's motorcycle states that the front/back wheel alignment measurements should be within .030 of an inch, and Thomas's motorcycle was .21875 of an inch, but considered the manual specifications "over specified." He testified that, "based on what I know about motorcycles and the alignment and its effect on them, this level of alignment wouldn't be a problem." He stated that he had "tested many different bikes with offsets such as this and of varying amounts with no issue." Christensen also testified that, based on Thomas reporting that his motorcycle was scraping the pavement as he went into a particular turn, it was possible Thomas was riding at a speed higher than fifty-five miles per hour. When asked if it was also possible that there was something wrong with Thomas's motorcycle, Christensen replied, "I didn't see anything that would indicate anything wrong with his bike."

Portions of deposition testimony of Gary Kmiecik were also read into evidence. Kmiecik was a mechanic hired by Thomas, tendered as an expert by Thomas, and deposed by Harley-Davidson. Kmiecik testified that he reviewed the accident report and service records of Thomas's motorcycle and also inspected the motorcycle. He had been asked to determine if Thomas's motorcycle would be sensitive to changes in the clamp load in F and G bolts with respect to stability and handling. He testified that the torque values on the bolts are part of the vehicle alignment, and that the "whole system can shift about those timings without those bolts being correctly tightened." Kmiecik testified that Thomas's vehicle was out of alignment by under one

4

fourth of an inch, and he did not see any indication from the damage on the motorcycle that the wreck caused that misalignment. Kmiecik testified that the most common cause of single vehicle motorcycle accidents is rider error, and that the most common form of rider error is a reflex in running wide in a corner. Kmiecik testified that he believed Thomas ran wide in the corner and ran off the road. He did not attribute the accident to the condition of the front and rear mounts on Thomas's motorcycle.

Thomas also offered portions of deposition testimony by Martin Hageman, a corporate representative of Harley-Davidson. Hageman testified that he determined the torque on the fasteners F and G had no detrimental effect on the stability of the motorcycle and could not have caused Thomas's crash. Hageman was asked about Patent 4,776,423. He testified Harley-Davidson may have acquired the patent when Harley-Davidson purchased the Buell Motorcycle Company. Hageman stated that he disagreed with the basic premise of the patent – that three links are required in the vibration isolated powertrain. He based this belief on the fact that Harley-Davidson's current touring motorcycle had only one tie link but was still vibration isolated. He testified that he knew three tie links were not required to establish lateral stiffness. When Hageman was asked how lateral stiffness could be established in Thomas's motorcycle other than by Patent 4,776,423, he replied, "By the design of the isolation system." He testified the isolator in Thomas's motorcycle was designed so that it had very high stiffness in one direction while being "compliant in another direction."

Thomas introduced himself as his final witness. Thomas testified that on the day of the wreck, he was scheduled to meet Billingsley at around noon but was moving slowly that morning. He called Billingsley at 12:04 and told him he would be there in five or ten minutes. Prior to the wreck, he had noticed no problems with the suspension or handling of the motorcycle. He testified

5

that as he rode his motorcycle to meet Billingsley, when he rounded a corner near Mt. Olive Road and Hunter Road, the rear end of his motorcycle felt "squishy." He stopped and inspected the shocks on his motorcycle. He could find nothing wrong so continued on.

There were six turns leading up to the accident. On the first, a sharp right, he accelerated slowly and noticed there was a little bit of a mushy feeling. This required him to lean into the curve more to counteract the motorcycle's behavior. He then engaged cruise control at fifty-five miles per hour -- the speed limit. At that time, there were no advisory signs of any kind on the highway and the only limit signs stated fifty-five. Thomas had driven that same road for nine years and had traveled that road on a motorcycle several hundred times. Thomas did not recall ever taking the road faster than fifty-five miles per hour.

With the second curve, to the left, the issue with the motorcycle seemed a little more pronounced. With each curve the problem became more pronounced and Thomas had to lean more and more because the bike was fighting him to stand up the opposite direction. Thomas crashed on the seventh curve, which Thomas testified was the least tight of any of the curves. He was not sure why he did not try to slow down when the issues with his bike began, but he was trying to troubleshoot and wanted to determine what was wrong with the bike. He was driving on the right half to right third of the lane, away from the centerline to avoid potential oncoming traffic. When the bike's footboard began to drag due to his lean, Thomas instinctively let up on the lean. When he did, the bike jerked straight up and he went off the road. Thomas received serious injuries from the accident and recovery was lengthy. The accident caused long-term damage to Thomas's body, and Thomas is unable to enjoy many activities he previously participated in.

On cross examination, Thomas testified he received an owner's manual with his motorcycle and familiarized himself with the parts he used most, including portions regarding the

6

cruise control. He acknowledged that, prior to the accident, he was aware the owner's manual stated that cruise control is not intended for use with sharp or blind curves, and that using cruise control in such circumstances could result in death or serious injury. He testified he never applied his brakes when proceeding through the curves on the road, despite noticing something different with his bike. He testified that, when his motorcycle scraped the footboard around the curve, he eased up on the lean to take a wider line around the curve, and that is when the motorcycle left the roadway.

Harley-Davidson introduced the testimony of Martin Hageman, a principal engineer for Harley-Davidson. He testified that part of his job is to provide technical assistance to lawyers who represent the company. Hageman inspected Thomas's motorcycle, and also the scene of the accident. He testified that, using physics, the lean angle of a motorcycle would be 31.8 degrees if the operator was in line with the motorcycle and traveling fifty-five miles per hour in the area of road Thomas was traveling. Thomas's model of motorcycle has 30 degrees of left lean available before anything touches the ground; in a curve, however, there is often more room for clearance. Hageman testified that, Thomas's account of hearing scraping and feeling scraping of his bike around the curves was plausible, given the speed he was traveling and the roadway. Hageman testified that, based on his experience and training as an accident reconstructionist and trained motorcycle rider, Thomas did not have to react at all to maintain his line through the curves. He stated that the radius of the road and the speed of the motorcycle establishes how far the rider needs to lean. Had Thomas desired the scraping of the footplate to stop, he could have reduced his speed. Reducing the speed of the motorcycle one mile an hour gives one-quarter inch clearance at the edge of the footboard and causes the lean to automatically straighten. Based on his work on the case, and training and experience, he believed the cause of the accident was rider error. Hageman

believed Thomas attempted to adjust the lean when the footboard scraped, which changed the direction the bike was going. Hageman testified that, based on his training and research, the most common cause of single vehicle motorcycle accidents is a combination of over braking or running wide in corners.

Bjorn Christensen, a mechanical engineer for Harley-Davidson and expert in motorcycle dynamics and riding, was called to testify for the defense.[1] He examined the accident scene, accident report, and pictures of the motorcycle. He also rode a motorcycle similar to Thomas's through the accident scene at varying speeds. This ride was video recorded, with both the video and still shots from the video played to the jury. Christensen testified to a belief that Thomas took the curve in the highway with excessive speed, causing his footboards to have contact with the road. He then eased up on the angle of the motorcycle and, in so doing, ran off the road. Christensen considered fifty-five miles per hour "very aggressive" for the crash corner. He testified that engaging the cruise control took away one of the major levels available to Thomas to change the attitude of the bike. Christensen believed that Thomas setting the cruise control on that road at that speed indicated that Thomas was not the best judge of how fast he should be going; Thomas's statement, that he would have been able to make it through that corner at eighty miles an hour with no problem, led Christensen to believe Thomas did not have the best judgment of appropriate speeds for corners.

Thomas called Curtis Edward Case, a man who had extensive experience riding and racing motorcycles, as a rebuttal witness. He testified that in observing the video of Christensen riding his motorcycle through the YY Highway curves, even at fifty-five miles per hour, "that appeared

_____

[1] Thomas introduced deposition testimony of this same expert in his case in chief.

8

to me to be a nice, easy Sunday afternoon cruise through the country." He testified that he would not have pulled in the clutch in the scenario described by Thomas because, if he had done so, "he would have been in the ditch in a heartbeat." Case testified that he had experienced several occasions, while racing, where he missed downshifts for corners on motorcycles. In such cases, the motorcycle goes straight off the corner, and the driver can only hope to maintain balance in the grass until the motorcycle slows enough to get back on the track. Had he been in Thomas's situation, Case would have changed his lean angle slightly, because rolling off the throttle tightens up the lean angle making the bike want to turn a tighter radius. This would mean the motorcycle would lean even closer to the ground. Consequently, the best course of action would have been to lessen the lean angle to prevent dragging.

After deliberation, the jury returned a unanimous verdict in favor of Harley-Davidson on all counts submitted. Thomas filed a Motion for New Trial which was denied by the court. This appeal follows.

### Point I – Admission of Evidence

In his first point on appeal, Thomas contends the circuit court abused its discretion in admitting Exhibit RR (a video of a motorcyclist expert retained by the defense to show driving conditions at the scene of the wreck) into evidence because it was neither logically nor legally relevant as it contained "advisory" speed limit signs that were not present the date of the accident and improperly emphasized these signs. Thomas contends that, because Harley-Davidson's counsel argued the wreck was caused by Thomas driving at an excessive speed for the circumstances (i.e. and, coincidentally, in excess of the advisory speed limit signs that were not present on the date of the wreck but were displayed in the Exhibit RR video played to the jury),

9

admission of Exhibit RR "affected the outcome of the trial with reasonable certainty" and deprived Thomas of a fair trial.

"'We review the trial court's admission or exclusion of evidence under a deferential standard of review.'" *McGuire v. Kenoma*, LLC, 375 S.W.3d 157, 183-184 (Mo. App. 2012) (quoting *Ziolkowski v. Heartland Regional Medical Center*, 317 S.W.3d 212, 216 (Mo. App. 2010)). On appellate review, the issue is not whether the evidence was admissible or should have been excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence. *McGuire*, 375 S.W.3d at 184. "A circuit court has broad discretion in determining the admission of evidence [.]" *Lewellen v. Franklin*, 441 S.W.3d 136, 149 (Mo. banc 2014). "The use of demonstrative evidence is a question that is left to the sound discretion of the trial court." *Grose v. Nissan N. Am., Inc.*, 50 S.W.3d 825, 830 (Mo. App. 2001) (citing *Moore v. Mo. Pac. R.R. Co.*, 825 S.W.2d 839, 846 (Mo. banc 1992)). "This standard applies to films and videotape." *Id.* "The admissibility of a video depends on whether it is practical, instructive, and calculated to assist the jury in understanding the case." *Id.* (citing *Nash v. Stanley Magic Door, Inc.*, 863 S.W.2d 677, 681 (Mo. App. 1993)).

A court abuses its discretion only when the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." *State v. Quick*, 334 S.W.3d 603, 609 (Mo. App. 2011) (citing *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)). Even if we find an abuse of discretion, we "will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo. App. 2009).

10

"To preserve evidentiary questions for appeal, there must be an objection giving the grounds at the time the evidence is sought to be introduced, and the same objection must be set out in the motion for new trial then carried forward in the appeal brief." *Harrell v. Cochran*, 233 S.W.3d 254, 259 (Mo. App. 2007). "The failure to object at the trial on the same basis as that asserted on appeal fails to preserve that issue for appellate review." *Woods v. Friendly Ford, Inc.*, 248 S.W.3d 699, 712 (Mo. App. 2008).

At trial and during the testimony of Bjorn Christensen, Harley-Davidson asked to introduce Exhibit RR-002, still photographs taken from a video (Exhibit RR) of Christensen riding through the crash scene on a motorcycle similar to Thomas's. When asked to identify the photographs, Christensen testified that they depicted Christensen riding through the exhibit scene at varying speeds of thirty-five, forty-five, and fifty-five miles per hour. He testified that the photographs accurately depicted the appearance of the motorcycle traveling the corners.

Thomas objected to the photographs as irrelevant, arguing that Christensen was not riding the exact line of trajectory Thomas rode. Harley-Davidson countered that the photographs were illustrative of the lean angle of the motorcycle required at increasing speeds, which was illustrative of the principles both Christensen and witness Hageman described; Harley-Davidson emphasized that the exhibit was not intended to be a recreation of any aspect of the accident. Thomas continued to argue relevance with regard to the line Thomas rode, and the court allowed the exhibit and advised Thomas that he could address his concerns on cross-examination. When the proceedings returned to open court, and Harley-Davidson moved to admit RR-002, the following colloquy occurred:

> THE COURT: And it's being offered only for the purpose of showing that there is some leaning that takes place at different speeds.

11

HARLEY-DAVIDSON COUNSEL:  Yes.

THE COURT:  Not offering it to show a recreation of what took place on the day of the accident.[2]

HARLEY-DAVIDSON COUNSEL:  This is not intended as a recreation of the accident.

THE COURT:  Okay.  So for that purpose, we will allow it.

Exhibit RR-002 was published to the jury and Christensen was asked if the pictures illustrated the concept that the motorcycle, when turning, has to lean more the faster the rider travels.

After asking Christensen questions regarding the motorcycle's ability to take the crash corner at eighty miles an hour (as Thomas testified was possible if the motorcycle had not been defective), Christensen testified, using Exhibit RR-002, that the lean at fifty-five miles per hour was thirty degrees, and sixty degrees would be required to take the curve at eighty miles per hour. He testified that a MotoGP bike, which is "the highest form of motorcycle racing" bike in the world, might be able to take that curve at eighty miles per hour, but Thomas's motorcycle could not.

Harley-Davidson then asked to introduce Exhibit RR, the video from which Exhibit RR-002's pictures were extracted.  Christensen testified that the video shows him riding the path Thomas took at thirty-five, forty-five, and fifty-five miles per hour.  Christensen wore a body camera capturing the speedometer of the motorcycle while he drove.  He testified that the video

_____

[2] "When the video is an attempt to re-enact the original event, the essential conditions in the video must be 'substantially similar' to those existing at the time of the accident." *Grose v. Nissan N. Am., Inc.*, 50 S.W.3d 825, 831 (Mo. App. 2001). "When, however, the video is offered merely to illustrate the principles used in forming an opinion, there is no requirement that the conditions portrayed in the video be substantially similar to those in the accident." *Id.* (citing *Beers v. W. Auto Supply Co.*, 646 S.W.2d 812, 815 (Mo. App. 1982)).

would be helpful in explaining his opinions about the propriety of riding a motorcycle like Thomas's at fifty-five miles per hour through the corner Thomas crashed.

Thomas objected to admission of the video on the same relevancy grounds as his objection to RR-002 – that, it was a recreation of the event and irrelevant if the motorcycle was not driven on the exact same line of trajectory as Thomas's motorcycle. Harley-Davidson countered that Harley's defense was that Thomas was going an imprudently high speed and the video showed what it looked like to ride through those curves at thirty-five, forty-five, and fifty-five miles per hour. Harley-Davidson argued that the video was not a recreation and was relevant because the same type of motorcycle and the same road was used in the video. The court allowed the video, advising Thomas that concerns as to relevancy could be addressed on cross-examination.[3]

When Exhibit RR was published to the jury, the court stated: "This is for purposes of clarity. This is not a recreation of what the Plaintiff was actually doing. It's just to show a view." Harley-Davidson's counsel stated: "This is to illustrate what riding a motorcycle of the sort involved in this accident, on the road involved in this accident at three different speeds is."

As the video was played for the jury, Christensen narrated the various scenes. No objections were raised while Exhibit RR was played, or during Christensen's direct testimony regarding Exhibit RR. Christensen was extensively cross-examined by Thomas's counsel regarding a variety of issues. Christensen explained that the reason he did not ride the motorcycle on the same line as Thomas was because Thomas reported to be driving on a line too close to the right edge of the road, which contained gravel in some spots, and this would have compromised

---

[3] "When a video is used to explain a principle asserted by one of the parties, inaccuracies or any unreliability features of the video can be exposed on cross-examination." *Daniel v. Ind. Mills & Mfg., Inc.*, 103 S.W.3d 302, 315 (Mo. App. 2003) (citing *Nash v. Stanley Magic Door, Inc.*, 863 S.W.2d 677, 681 (Mo. App. 1993). "In that way a jury can properly evaluate the evidence and assign it appropriate weight." *Id.*

13

Christensen's ability to control the motorcycle. When questioning Christensen regarding his testimony about Thomas's use of cruise control, counsel asked, "By the way, whose bright idea was it to show the – to do slow mos of the advisory signs that went up in 2010 – excuse me, in 2009? Was that your bright idea?" Harley-Davidson's counsel interjected that the evidence had already shown that the advisory signs were erected in 2006, and Harley-Davidson would stipulate that they were not up at the time of the wreck. Christensen testified that it was not his idea to slow down the video to show the advisory signs.

At the close of Christensen's testimony, the defense rested. Thomas's counsel then approached the bench and argued:

> Judge, based upon the testimony of this witness, it is amazingly obvious that this was put there for – in terms of his testimony, for a recreation. And as such, I would move that you strike the exhibit – both R-2 and RR, and I might have to ask for a mistrial, because that never should have came in. That is what it was for, and he testified that is what it was for.

Thomas argued Christensen could have used a computer model to represent the same thing. The court denied the motion. The record reflects no more discussion of the slow motion aspect of Exhibit RR, or the advisory signs added to the roadway after the accident, until Thomas's hearing on his motion for new trial. These issues were not mentioned by either party in closing argument.

Thomas's argument on appeal, that Exhibit RR was irrelevant because inclusion of "advisory" speed signs did not accurately represent the scene of the wreck, was not preserved. At trial, Thomas argued the video was irrelevant because it depicted Christensen riding the motorcycle on a different line in the road than Thomas had. (Thomas has abandoned this argument on appeal.) When the video was played for the jury, Thomas made no objection to the presence of the advisory speed signs or the focus on those signs. Even after the video was published to the jury, Thomas never argued that the advisory signs rendered the video irrelevant to the issues. While Thomas

14

now argues the trial court should have reviewed Exhibit RR before it was admitted into evidence and forced redaction of the advisory signs, this ignores that Thomas knew or should have known of the contents of the video and it was Thomas's duty to alert the court to any improper content; the court had no duty to *sua sponte* seek something not brought to its attention.[4] Thomas had every opportunity to object to the video based on the content he now contends rendered it inadmissible, but did not.[5] Further as the record during trial indicates, and as his counsel conceded at oral argument, Thomas did not seek relief from the trial court by requesting a limiting instruction or mistrial after the video had been played to the jury. Missouri appellate courts have long been reluctant to convict a trial court of error when the complaining party did not seek relief from the trial court during the trial. *See Wilborn v. Wilborn*, 445 S.W.3d 629, 635 (Mo. App. 2014); *See also Heck v. Heck*, 318 S.W.3d 760, 767 (Mo. App. 2010); *SD Invs., Inc. v. Michael-Paul, L.L.C.*, 90 S.W.3d 75, 84 (Mo. App. 2002); *Scism v. Scism*, 844 S.W.2d 506, 507 (Mo. App. 1992).

Although Thomas contends Exhibit RR allowed Harley-Davidson to argue the wreck was caused by Thomas's negligence in driving in excess of the advisory speed limit signs, Harley-Davidson never mentioned the signs at trial except to concede that they were not present the day of the accident. Harley-Davidson's defense was always "rider error" – Thomas drove his motorcycle around the corner too fast, improperly reacted when he felt the footboards scraping the pavement, and ran off the road. To be clear, we do not condone what may very well have been an intentional attempt by the defense to subliminally influence the jury (i.e. by way of slow motioning

---

[4] We reject Thomas's suggestion in his reply brief that the trial court had a duty to *sua sponte* demand review of the video and then *sua sponte* order redaction of portions of that video.

[5] All court comments regarding the video that Thomas cites in his appeal brief originate from Thomas's hearing on his motion for new trial – the first time Thomas approached the trial court with the issue.

the video and zooming in on the 30 mph advisory sign) and caution that, under a record different than that before us, such might have resulted in mistrial. That being said, this specific issue was not before the trial court and we cannot "convict the trial court of reversible error based on the admission of evidence . . . [as] to which no objections were made," or where the "argument [ ] on appeal [is] materially different from the objection [ ] … raised at trial." *Gamble v. Browning*, 379 S.W.3d 194, 204-05 (Mo. App. 2012).[6]

The circuit court did not abuse its discretion in allowing Exhibit RR. Thomas's first point on appeal is denied.

### Point II – Exclusion of Evidence

In Thomas's second point on appeal, he contends the circuit court abused its discretion in refusing to admit Exhibits 1 (Patent No. 4,775,423), 10 (Patent No. U.S. 2005/0006163), and 11 (Patent No. 6,213,240), on hearsay grounds.[7] He argues the patents were admissions by Harley-Davidson because they were owned by Harley-Davidson, therefore proving Harley-Davidson knew of a design defect in Thomas's motorcycle at the time it designed and built that motorcycle. Thomas argues that inventors include all safety-related advantages in patent applications, and the patents at issue proved a defect in Thomas's motorcycle, demonstrated the feasibility of alternative designs, and established Harley-Davidson's knowledge of a hazard.

---

[6] Even if this issue had been preserved, it was made clear to the jury that there were no advisory signs at the time of the accident, and Thomas was traveling the posted speed limit. The fact that Thomas was traveling the posted speed limit did not preclude Harley-Davidson from arguing, and the jury believing, that Thomas was, nevertheless, traveling too fast given the particular roadway. Thomas's case alleged negligent design of the motorcycle and strict product liability; Thomas produced no expert evidence to support this claim. Harley-Davidson produced several experts who testified that there was no defect with Thomas's motorcycle and the cause of the crash was rider error. Given the evidence, the jury could have determined Thomas failed to meet his burden of proving negligence and defective design without needing to reach a conclusion as to the actual cause of the accident. We find that, even if the exhibit was erroneously admitted, there is no reasonable likelihood it affected the outcome of the trial.

[7] As Thomas attempted only to offer Exhibit 1 at trial, we address only Exhibit 1. Nevertheless, given Thomas's description on appeal of the additional exhibits, the same rationale for exclusion would apply.

16

"A hearsay statement is an out-of-court statement offered for the truth of the matter asserted therein and depends on the veracity of the statement for its value." *Saint Louis University v. Geary*, 321 S.W. 3d 290, 291 (Mo. banc 2009) (internal quotation marks and citation omitted). "Hearsay evidence is objectionable because the person who makes the statement offered is not under oath and is not subject to cross-examination." *Id.* "Hearsay is inadmissible unless it fits into a recognized exception, or it is used for a nonhearsay purpose." *Id.* Admissions of a party-opponent contain hearsay, but there is an exception for their admissibility. *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 870 (Mo. App. 2013). As Thomas offered the patent as an admission of a party-opponent, Thomas conceded the patent included hearsay; the question is whether the patent was, in fact, an admission of a party-opponent such that the admissions exception to exclusionary hearsay rule applied.

Statements of a party-opponent may be admitted at trial as an exception to the hearsay rule if they meet certain requirements. *Doe v. McFarlane*, 207 S.W.3d 52, 72 (Mo. App. 2006). "First, the admission must be a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts." *Id.* "Second, the matter acknowledged must be relevant to the cause of the party offering the admission." *Id.* "Finally, the matter acknowledged must be unfavorable to, or inconsistent with, the position taken at trial by the party-opponent." *Id.*

We first note that, although Thomas quotes from Exhibit 1 in his appeal brief, Thomas failed to include a copy of Exhibit 1 in the record on appeal. "Where the record on appeal contains evidentiary omissions, we presume they support the trial court's decision." *Stroh v. Stroh*, 454 S.W.3d 351, 355 (Mo. App. 2014). Nevertheless, even ignoring this presumption and assuming everything Thomas states about Exhibit 1 is true, Thomas still fails to establish Exhibit 1 is an admission of a party-opponent.

17

According to Thomas, Patent 4,776,423 was issued to Erik Buell in 1988. Buell makes claims within the patent application that, in certain of Norton and Harley-Davidson motorcycle designs, vibrations that caused rider and chassis fatigue prompted manufacturers to mount the rear suspension in a certain manner. Buell contends that, although those improvements reduced vibration, the designs "suffered significantly in both handling and stability because the rear wheel can be deflected from the plane of the front wheel in the Z axis." Patent 4,776,423 is Buell's invention to correct that purported issue.

Deposition testimony of Martin Hageman, offered by Thomas, was that Harley-Davidson "may have obtained [Patent 4,776,423] when we purchased Buell." Buell founded a motorcycle company in 1983, and Harley-Davidson purchased that company in part in 1993 and in whole by 2003. Thomas contends that Harley-Davidson's current ownership of the patent renders its contents an admission by Harley-Davidson, a party-opponent. We disagree that Harley-Davidson's mere acquisition of the Buell patent in the Buell buyout is sufficient to show a conscious or voluntary acknowledgment by Harley-Davidson that the facts stated therein are true. Buell was not an employee of Harley-Davidson at the time he made the averments and represented an entirely different motorcycle company. Further, Thomas himself offered the deposition testimony of Hageman (an employee of Harley-Davidson) who testified that he disagreed with the premise of Buell's patent.[8]

---

[8] Thomas also failed to prove that the content of the patent was truly relevant to his cause as there was no expert testimony that, had this design been implemented, Thomas's accident might have been avoided. Thomas offered Exhibit 1 as self-proving of the averments within, and offered no experts to attest that the statements were true, that Buell's design is superior to Harley-Davidson's, or that any design defect existed at all with Thomas's motorcycle such that Buell's invention would have corrected it.

18

Thomas failed to prove Exhibit 1 constituted an admission by a party-opponent and, therefore, an exception to the general rule of hearsay exclusion. The circuit court did not abuse its discretion in denying Exhibit 1. Thomas's second point on appeal is denied.

## Point III – Weight of the Evidence

Thomas contends the circuit court erred in overruling his motion for new trial, arguing the jury verdict was against the weight of the evidence because the evidence at trial proved Thomas's motorcycle was defective and unreasonably dangerous because other possible causes for the accident were eliminated.

Thomas, as plaintiff, bore the burden of proof at trial. *Beverly v. Hudak*, 545 S.W.3d 864, 878 (Mo. App. 2018). Because Thomas bore the burden of proof, a verdict in Harley-Davidson's favor need not be supported by any evidence. *Id.*

> Where a party bears the burden of proof, it is within the jury's prerogative to find against that party, even if that party's evidence is uncontradicted and unimpeached. The jury has that prerogative because the jury determines credibility. Following the jury's verdict, the trial court alone has discretion to grant or deny a motion for new trial on the ground that the verdict [in favor of the defendant] was against the weight of the evidence. The trial court's overruling a motion for new trial on that ground constitutes a conclusive determination that cannot be overturned on appeal.

*Id.* (internal citations and quotation marks omitted).

The jury was entitled to disbelieve Thomas's claim that the motorcycle was defective and unreasonably dangerous, even if all other possible causes for the accident were eliminated. The court did not err in overruling Thomas's motion for new trial. Thomas's third point on appeal is denied.

19

**Conclusion**

We conclude that Thomas failed to preserve for review his claim that the circuit court abused its discretion in admitting Exhibit RR.  Further, the circuit court did not abuse its discretion in denying admission of Exhibit 1 on hearsay grounds.  Finally, the circuit court did not err in overruling Thomas's motion for new trial on grounds that the jury verdict was against the weight of the evidence.

We affirm the circuit court's judgment.

_____
Anthony Rex Gabbert, Judge

All concur.